

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:15cr221-FDW |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| (1) WALTER EUGENE LITTERAL | ) | Violations: 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 922(a)(6) |
| | ) | 18 U.S.C. § 922(g)(1) &(3) |
| | ) | 18 U.S.C. § 924(a)(2) |
| | ) | 21 U.S.C. § 846 |
| | ) | 21 U.S.C. § 841(a)(1) |
| | ) | 26 U.S.C. § 5861(d) |
| | ) | 26 U.S.C. § 5861(f) |
| | ) | 26 U.S.C. § 5871 |

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times material to this Bill of Indictment:

1. WALTER EUGENE LITTERAL ("LITTERAL"), defendant herein, believed the United States was in danger of a military coup and solicited others to prepare to attack military and law enforcement personnel in the event martial law was declared. In particular, LITTERAL solicited and aided and abetted others in the acquisition of firearms and components necessary to manufacture improvised explosive devices—i.e., pipes bombs constructed from smokeless gun powder, pipes and pipe fittings, grenades manufactured from M-80 fireworks and other materials. LITTERAL also sold prescription drugs to finance his activities.

2. Christopher Todd Campbell ("Campbell"), an unindicted codefendant herein, was a friend of LITTERAL's. Campbell also believed the United States was in danger of a military coup and/or a foreign invasion. LITTERAL advised Campbell on preparations for an attack, including how to reconstruct a dummy grenade into a live grenade. LITTERAL and Campbell acquired firearms, explosives, destructive devices and other military equipment that they stated they would use against law enforcement personnel who attempted to disarm them.

3. Christopher James Barker ("Barker"), an unindicted codefendant herein, was a friend of LITTERAL's. Barker was prohibited from purchasing or possessing a firearm or firearm

ammunition due to 1993 convictions for felony possession of stolen goods and felony possession of cocaine, as well as his illegal use and addiction to hydrocodone and oxycodone. Barker's 1993 convictions in Gaston County, North Carolina, were then punishable by a term of imprisonment exceeding one year. At no time was Barker pardoned or his convictions expunged; nor had he petitioned for restoration of his right to possess a firearm.

4. LITTERAL was prescribed medication for various ailments and disorders, including hydrocodone and oxycodone. LITTERAL was receiving approximately 240 hydrocodone pills and approximately 90 oxycodone pills per month, of which he sold approximately 100 hydrocodone pills and 50 to 60 oxycodone pill per month to Barker beginning in and around 2013. LITTERAL also sold prescription medication to Campbell. LITTERAL knew that Barker and Campbell were not lawful users of hydrocodone and oxycodone prescribed to LITTERAL. Barker was addicted to these drugs. Hydrocodone and oxycodone are controlled substances under Title 21, United States Code, Section 802.

## Applicable Firearm and Explosives Laws and Regulations:

5. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regulates and licenses firearms and explosives dealers. The Federal Bureau of Investigation is responsible for the operations of the National Instant Criminal Background Check System (NICS). The ATF and the FBI are components of the United States Department of Justice, an agency of the United States.

6. Under the National Firearms Act (NFA), firearms as defined and listed in Title 26, United States Code, Section 5845(a), must be registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in the National Firearms Registration and Transfer Record (NFRTR). The "maker" of a covered firearm is defined as a person who manufactures, puts together, alters or otherwise produces a firearm. The maker or subsequent transferor may thereafter transfer the weapon only pursuant to the NFA, which requires that the maker identify itself or himself, the firearm, and the transferee, and apply for and receive approval from ATF.

7. A firearm as defined in Title 26, United States Code, Section 5845(a) includes "(8) a destructive device." The term "destructive device" as defined in Title 26 United States Code, Sections 5845(a)(f) to mean, in pertinent part, (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, ... or (F) similar device; ... and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined [above] and from which a destructive device may be readily assembled."

8. Congress enacted the Gun Control Act (GCA) to keep firearms out of the hands of those persons not legally entitled to possess them because of their age, criminal background or incompetency. Under the GCA, it is illegal for persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding one year and/or are

2

addicts and unlawful users of controlled substances to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

9. In order to lawfully purchase a firearm in the United States from a licensed dealer, the purchaser must complete an ATF Form 4473. This form requires the buyer to identify himself or herself, provide an address, date and place of birth, social security number or other identifying number, and state of residency. In addition, the buyer must certify that he or she is the actual buyer of the firearm and state whether he is a citizen of the United States.

10. The term "straw purchase" as used herein, refers to a circumstance in which the true purchaser, who is ineligible to lawfully purchase the firearm, uses a middleman who is eligible to conduct the transaction and complete the ATF Form 4473 in the middleman's name. A straw purchase occurs anytime an individual purchases a firearm for someone else, unless the purchase is a gift. It is also a violation of the GCA to make false statements intended to deceive a federal firearms dealer with respect to facts material to the lawfulness of a firearm sale.

### LITTERAL and Campbell:

11. Beginning no later than February 2015, LITTERAL and Campbell began purchasing items from a certain military surplus supply store in Gaston County, North Carolina, in order to prepare for an attack by U.S. and/or foreign forces. The items that LITTERAL and Campbell purchased and planned to purchase included smokeless gun powder, dummy grenades and fuses. LITTERAL and Campbell gave the store owner specific information on how they were going to manufacture destructive devices.

12. LITTERAL said he wanted to pack tennis balls with gun powder and Tannerite, and tape nails to the outside of the balls. Tannerite is the brand name for a binary explosive marketed over the Internet and various retail stores for making explosive targets for firearms practice. Tannerite is intended to be detonated when shot by a high-velocity firearm cartridge and has reportedly been used for detonating larger explosive devices when mixed with other materials. LITTERAL referred to these devices as "game changers." LITTERAL also planned to use coffee cans to create explosive devices by filling them with gun powder and ball bearings, placing them in a location and detonating them with a long range rifle shot. Another plan discussed by LITTERAL was to place M-80 fireworks inside pipe bombs packed with gun powder in order to detonate them. Neither LITTERAL nor Campbell are licensed to manufacture firearms.

13. Beginning in and around February 2015, and continuing through on or about August 1, 2015, Campbell purchased and acquired a dummy grenade, smokeless gun powder, and an igniter from a military supply shop in Gaston County, North Carolina, with the intent to convert these materials into a live grenade—i.e., a destructive device as defined in Title 26, United States Code, Section 5845(a)(8) and (f). Campbell intended that the re-manufactured dummy grenade be used as a weapon; not as an antique or solely for

3

sporting purposes. LITTERAL aided and abetted Campbell's reconstruction of a dummy grenade for use as a weapon by meeting with Campbell and advising him on how to maximize the success and impact of the intended explosion, including the need to compress the gun powder, the proper length of fuses and the suitability of a tripwire to detonate the device.

14. The dummy grenades purchased by CAMPBELL included a "pineapple grenade" that had been rendered inert by emptying the gun powder from the body of the device, drilling holes through the metal casing of the body and removing the igniter. Dummy grenades are not destructive devices because they have been redesigned and are not intended for use as a weapon.

15. Pineapple grenades, also known as MkII grenades, are fragmentation type hand grenades with a M201A1 Fuze commonly used by the U.S. military in World War II and later conflicts. The threaded body of the grenade is made of cast iron with a grooved surface designed to fragment when exploded. The fuse assemblies on MkII grenades are screwed into threads on top of the body and include a small length of safety fuse terminated with a black powder igniter charge, but could also include a percussive cap such as that found in a shotgun shell. The fuses have a delay of four to five seconds before exploding. Low explosive MkII grenades commonly used as anti-personnel weapons were filled with smokeless gun powder because they produce adequate fragmentation to kill or injure and did not require a detonator.

16. Campbell, aided and abetted by LITTERAL, manufactured, put together, altered and otherwise produced a firearm, to wit: a combination of parts designed and intended to reconstruct a dummy grenade into a live grenade by plugging the hole(s) drilled in the body of the dummy grenade, replacing the missing igniter with a percussive cap he had removed from a shotgun shell and purchasing smokeless gun powder which he stored near the reconstructed dummy grenade so these parts could be readily assembled into a destructive device.

17. CAMPBELL kept the combination of parts with which to readily assemble his re-manufactured grenade with its improvised igniter on top of a safe in a small house he shared with his fiancé and two children. CAMPBELL also kept smokeless gun powder in a container in the safe below the re-manufactured grenade. Even when not fully charged with gun powder, the converted grenade could be readily assembled by simply unscrewing the fuse assembly, filling the body with gun powder and reattaching the fuse assembly. Such a destructive device could kill any person within 5 meters and injure anyone within 15 meters.

18. Campbell also assisted LITTERAL financially by purchasing drugs prescribed to LITTERAL.

4

**LITTERAL and Barker:**

19. On or about June 19, 2015, LITTERAL told the military supply store owner that he already had pipes and pipe ends necessary to manufacture pipe bombs and could easily buy M-80 fireworks in South Carolina—a short drive from his residence—to be used detonate his pipe bombs. LITTERAL said he had at least 30 weapons in his house and truck and planned to rig his house with explosives to kill any Government agent who might try to enter. Because LITTERAL did not want to buy all of the components for his pipe bombs at stores where his purchases could be recorded, he recruited Barker—who worked with plumbing supplies—to provide him with pipes and pipe fittings. Barker did in fact provide pipes to LITTERAL, but unknown to LITTERAL had decided to provide pipes and pipe or ends that would not fit each other. However, LITTERAL did possess at least one pipe with pipe ends screwed together. Small holes had been drilled into the pipe ends through which fuses could pass.

20. On or about July 8, 2015, LITTERAL purchased eight pounds of smokeless powder from the military surplus store and told the store owner that he intended to use that powder to make pipe bombs.

21. Beginning no later than on or about July 17, 2015, and continuing until August 1, 2015, LITTERAL and Barker agreed that LITTERAL would purchase an assault rifle for Barker because they both well knew that Barker was a convicted felon, an illegal user of prescription drugs and addicted to hydrocodone and oxycodone. Barker, therefore, was prohibited from possessing or receiving any firearm or ammunition that had been shipped or transported in interstate commerce.

22. On or about July 17, 2015, LITTERAL went to the Gander Mountain store at 3704 East Franklin Blvd, Gastonia, North Carolina ("Gander Mountain") to purchase a certain Smith and Wesson MP-15 assault rifle, serial number SX23718, on behalf of Barker. Barker had previously given LITTERAL between $700 and $800 to purchase the rifle. At Gander Mountain, LITTERAL filled out an electronic ATF Form 4473 on which he falsely stated and attested under oath that he was the actual buyer of the firearm, whereas he then well knew that the he was purchasing the rifle for Barker with Barker's money. Gander Mountain employees did not immediately transfer the rifle to LITTERAL due to a "delay" order issued after the required NICS check was conducted.

23. On or about July 19, 2015, LITTERAL and Barker discussed which types of ammunition Barker should purchase for the Smith and Wesson MP-15 assault rifle that LITTERAL attempted to purchase at Gander Mountain. On July 19, 2015, Barker went to Gander Mountain where he purchased ammunition (approximately 100 Remington American Eagle 223 full metal jacket bullets) and a ProMag AR-15 magazine (which can hold 30 rounds). Both the ammunition and the magazine were found in Barker's residence during a consensual search by law enforcement on August 1, 2015.

24. The Smith and Wesson MP-15 assault rifle which LITTERAL attempted to purchase was manufactured outside the State of North Carolina and shipped in interstate commerce to Gander Mountain.

25. The Remington American Eagle 223 full metal jacket bullets purchased by Barker were manufactured outside the State of North Carolina and shipped in interstate commerce to Gander Mountain.

# COUNT ONE

Violation: 18 U.S.C. § 371
(Conspiracy).

26. Paragraphs 1, 3 through 10, and 19 through 25 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

27. Beginning no later than on or about March 1, 2015, and continuing until on or about August 1, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere,

### (1) WALTER EUGENE LITTERAL,

defendant herein, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with Barker and other individuals both known and unknown to the Grand Jury:

a. to defraud the United States by deceitful and dishonest means for the purpose of impeding, impairing, obstructing, and defeating the lawful functions of the United States Department of Justice in its regulation of the lawful sale and manufacture of firearms; and

b. to violate the laws of the United States, including:

  i. Title 18, United States Code Section, 922(a)(6), which makes it unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition;

  ii. Title 18, United States Code Section, 922(g)(1), which makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any

6

firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce; and

    iii. Title 18, United States Code Sections, 922(g)(3), which makes it unlawful for any person who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act) to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

## MANNER AND MEANS

28. The defendant, Barker and others known and unknown to the Grand Jury did carry out the conspiracy by the manner and means described in the Introductory paragraphs of this Bill of Indictment.

## OVERT ACTS

29. In furtherance of this conspiracy and to affect the objects thereof, at least one of the co-conspirators committed at least one of the following overt acts, among others, in the Western District of North Carolina:

    a. On or about July 17, 2015, in Gaston County, North Carolina, Barker gave LITTERAL between $700 and $800 to purchase a firearm both knowing that Barker was prohibited from possessing a firearm or ammunition because he was a convicted felon.

    b. On or about July 17, 2015, in Gaston County, North Carolina, LITTERAL attempted to acquire a certain Smith and Wesson MP-15 assault rifle for Barker in a straw purchase from Gander Mountain;

    c. On or about July 17, 2015, in Gaston County, North Carolina, LITTERAL did execute an ATF Form 4473, Firearms Transaction Record, (Form 4473) to the effect that he was the actual buyer of the firearm indicated on the Form 4473, when in fact as Defendants then well knew, LITTERAL was not the actual buyer of the firearm; and

    d. On or about July 19, 2015, in Gaston County, North Carolina, Barker went to Gander Mountain where he used his debit card to purchase 100 Remington American Eagle 223 full metal jacket bullets and a ProMag AR-15 30-round magazine for use with the Smith and Wesson AR 15 that LITTERAL was attempting to acquire for Barker.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

Violation: 18 U.S.C. § 922(a) (6)(False statement during the attempted purchase of a firearm).

30. Paragraphs 1, 3 through 5, 8 through 10, and 20 through 25 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

31. On or about July 17, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere, the defendant,

### (1) WALTER EUGENE LITTERAL,

in connection with the attempted acquisition of a firearm, a certain Smith and Wesson MP-15 assault rifle, serial number SX23718, from Gander Mountain, a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, knowingly made a false and fictitious written statement to Gander Mountain, which statement was intended and likely to deceive Gander Mountain, as to a fact material to the lawfulness of such sale of the said firearm to LITTERAL under Chapter 44 of Title 18, United States Code, in that LITTERAL represented on an ATF Form 4473 that he was "the actual transferee/buyer of the firearm(s) listed on [the] form," when he then well knew that Barker was the actual transferee/buyer.

All in violation of Title 18, United States Code, Sections 922(a)(6), 924(a)(2) and 2.

## COUNT THREE

Violation: 18 U.S.C. §§ 2 and 922(g) (Aiding and abetting the possession of ammunition by a prohibited person).

32. Paragraphs 1, 3 through 5, 8 through 10, and 20 through 25 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

33. Beginning on or about July 17, 2015, and continuing through on or about July 19, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere,

### (1) WALTER EUGENE LITTERAL,

defendant herein, did willfully aid, abet, counsel, command and induce Barker to possess and receive in and affecting interstate commerce ammunition, that is, 100 Remington American Eagle 223 full metal jacket bullets, said ammunition having been shipped and transported in interstate commerce and then knowing that Barker was prohibited person from possessing said ammunition because he had been convicted of a crime punishable by imprisonment for a term exceeding one year and was then an unlawful user and

8

addicted to hydrocodone and oxycodone, controlled substances as defined in Title 18, United States Code, Section 802.

All in violation of Title 18, United States Code, Sections 2, 922(g)(1) and (3), and 924(a)(2).

# COUNT FOUR

Violation: 18 U.S.C. § 2 and 26 U.S.C. §§ 5861(f) and 5871 (Aiding and abetting the making a firearm in violation of the NFA).

34. Paragraphs 1 through 2, 5 through 7, and 11 through 20 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

35. Beginning no later than on or about February 1, 2015, and continuing until on or about August 1, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere,

### (1) WALTER EUGENE LITTERAL

defendant herein, did willfully aid, abet, counsel, command and induce Campbell to assemble a combination of parts intended for use in readily converting a device into a destructive device, to wit: a live grenade in violation of the NFA.

All in violation of Title 18, United States Code, Section 2, and Title 26, United States Code, Sections 5822, 5845(a)(8) and (f), 5861(f) and 5871.

# COUNT FIVE

Violation: 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (Conspiracy to distribute and possess Schedule II controlled substances).

36. Paragraphs 1 through 4 and 18 through 23 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

37. Beginning no later than October 6, 2014, and continuing through on or about August 1, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere,

### (1) WALTER EUGENE LITTERAL

did knowingly and intentionally combine, conspire, confederate and agree with Barker, Campbell and other persons known and unknown to the Grand Jury, to distribute and to possess with intent to distribute controlled substances, in a violation of Title 21, United States Code, Section 841(a)(1).

9

a. Said offense involved a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(C).

b. Said offense involved a mixture and substance containing a detectable amount of hydrocodone, a Schedule II controlled substance. , in violation of Title 21, United States Code, Section 841(b)(1)(C).

All in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(C).

# COUNT SIX

Violation: 21 U.S.C. § 841(a)(1) and (b)(1)(C). (Illegal distribution and possession with intent to distribute Schedule II controlled substances).

38. Paragraphs 1 through 4 and 18 through 23 of the Introduction of this Bill of Indictment are re-alleged and incorporated herein.

39. Beginning no later than October 6, 2014, and continuing through on or about August 1, 2015, in Gaston County, within the Western District of North Carolina, and elsewhere,

### (1) WALTER EUGENE LITTERAL

did knowingly and intentionally distribute and possess with intent to distribute a mixture and substance containing a detectable amount of hydrocodone and oxycodone, Schedule II controlled substances.

All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

40. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given of 18 U.S.C. § 924 and 28 U.S.C. § 2461(c). The following property is subject to forfeiture in accordance with Section 924 and/or Section 2461(c): all firearms, ammunition or materials from which destructive devices could be manufactured as set forth in this Bill of Indictment.

41. The United States Attorney finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

   i. Hogdon 414 Rifle Powder (8lbs),
   ii. Ten (10) Pipe nipples,
   iii. Seven (7) End Caps,
   iv. Rifle Ammunition 3908 rounds. (.223/5.56, .338 Lapua, .300 Blackout, .22LR),
   v. Handgun Ammunition 1712 rounds (.45 cal, 9mm, .380 cal, .357 Sig, .32 cal, .38 special, .40 cal),
   vi. Shotgun Slugs 48 rounds,
   vii. Shotgun Buckshot 232 rounds, and
   viii. Shotgun rounds Birdshot 131 rounds.

A TRUE BILL:



JILL WESTMORELAND ROSE
ACTING UNITED STATES ATTORNEY

MICHAEL E. SAVAGE
ASSISTANT UNITED STATES ATTORNEY