IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
                                )   DOCKET NO. 3:15-CR-221
            vs.                  )
                                )
WALTER EUGENE LITTERAL,          )
                                )
            Defendant.           )
_____)


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE FRANK D. WHITNEY
UNITED STATES CHIEF DISTRICT COURT JUDGE
TUESDAY, JUNE 28, 2016 AT 10:15 A.M.


APPEARANCES:

On Behalf of the Government:

        MICHAEL E. SAVAGE, ASSISTANT U.S. ATTORNEY
        U.S. Attorney's Office
        227 W. Trade Street, Suite 1650
        Charlotte, North Carolina  28202


On Behalf of the Defendant:

        JOHN PARKE DAVIS, ESQ.
        Federal Defenders of Western North Carolina
        129 West Trade Street, Suite 300
        Charlotte, North Carolina  28202




        JILLIAN M. TURNER, RMR, CRR, CLR
            Official Court Reporter
          United States District Court
           Charlotte, North Carolina

# I N D E X

PAGE

GOVERNMENT'S WITNESSES

MARK MOSS

        Direct Examination by Mr. Savage          9
        Cross-Examination by Mr. Davis            15

```
 1    (Tuesday, June 28, 2016 at 10:15 a.m.)
 2                    P R O C E E D I N G S
 3          (Counsel and defendant present.)
 4          THE COURT:  Good morning.
 5          MR. SAVAGE:  Good morning, Your Honor.
 6          THE COURT:  I appreciate counsel allowing me to
 7    push this hearing forward a little bit in time.  We finished
 8    our earlier hearings more quickly than anticipated.  I
 9    believe this one will take a little long longer, so it's
10    better to start early.
11          We are here in United States v. Walter Eugene
12    Litteral, Case 3:15-CR-221, for Mr. Litteral --
13          And am I saying that correctly, Mr. Davis,
14    Litteral?
15          MR. DAVIS:  You are, Your Honor.
16          THE COURT:  -- Mr. Litteral's sentencing.  And
17    Mr. Davis is here on behalf of the defendant, and Mr. Savage
18    is here on behalf of the United States.
19          Mr. Taylor is not here.  I guess you're handling
20    the forfeiture, Mr. Savage?
21          MR. SAVAGE:  Yes, Your Honor.  I will do my best.
22          THE COURT:  All right.
23          All right.  Mr. Litteral, will you please stand.
24          Sir, do you recall appearing before Magistrate
25    Judge David Cayer on December 18th of last year for the
```

1    purpose of entering three pleas of guilty?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And do you remember being put under

4    oath at that time?

5              THE DEFENDANT:  Yes, sir, I do.

6              THE COURT:  And do you remember answering a series

7    of questions of Judge Cayer?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Were all of your answers to all of his

10   questions true and correct?

11             THE DEFENDANT:  Yes, sir, they was.

12             THE COURT:  If I were to ask you those same

13   questions again today, would your answers be the same?

14             THE DEFENDANT:  Absolutely.

15             THE COURT:  And on that day you were asked to

16   review a document, an electronic document known as the

17   Acceptance of Plea Form.  On that document is listed all the

18   questions that you're asked during the course of the hearing.

19   As you answer each question, the magistrate judge checks off

20   your answer.  At the end of the hearing you're asked to

21   review the document to make sure it's correctly filled out

22   and you're asked to sign it.

23             Did you review and sign that document?

24             THE DEFENDANT:  Yes, I did, sir.

25             THE COURT:  All right.  Thank you, sir.

1          Mr. Davis, were you present at that Rule 11

2    hearing?

3          MR. DAVIS:  I was, Your Honor.

4          THE COURT:  Do you believe Mr. Litteral fully

5    understood Judge Cayer's questions?

6          MR. DAVIS:  I do.

7          THE COURT:  Thank you.

8          Mr. Litteral, one last question, and it's the most

9    important question that I will ask you today.  On December 18

10   of last year, you admitted to Judge David Cayer you were

11   guilty of three federal felonies.  The first of those,

12   Count One, was conspiracy to defraud the United States in

13   violation of Title 18, United States Code, Section 371.  The

14   second of those was Count Two of the bill of indictment,

15   knowingly make -- knowingly making false -- a false statement

16   during the attempted purchase of a firearm in violation of

17   Title 18, U.S. Code, Section 922(a)(6) and Title 18, U.S.

18   Code, Section 924(a)(2).  And thirdly, Count Three, aiding

19   and abetting possession of ammunition by a prohibited person

20   in violation of Title 18 U.S. Code Section 922(g), Title 18,

21   United States Code, Section 924(a)(2), and Title 18, U.S.

22   Code, Section 2.

23          Now, I ask you again this morning are you, in fact,

24   guilty of those three federal felonies?

25          THE DEFENDANT:  Yes, sir, I am.

1          THE COURT:  All right.  Thank you, sir.

2          Based upon those representations and the answers

3   given by the defendant at the Rule 11 hearing before

4   Judge Cayer, the Court affirms Judge Cayer's findings that

5   defendant's pleas were knowingly and voluntarily made and

6   that defendant fully understood the charges, the potential

7   penalties and consequences of his three pleas of guilty.

8   Accordingly, the Court affirms the magistrate judge's

9   acceptance of defendant's plea of guilty at the Rule 11

10  hearing.

11         Now, separate from and independent of the

12  magistrate judge, this Court has reviewed the entire record

13  in this case, including the Rule 11 colloquy, and this Court

14  also finds as a matter of fact that the defendant's plea was

15  knowingly and voluntarily made and that defendant fully

16  understood the charges, potential penalties and consequences

17  of his three pleas.  Accordingly, the Court accepts the

18  defendant's pleas of guilty and the Court hereby adjudicates

19  the defendant guilty of the three felonies.

20         Now, the parties have entered into a written

21  factual basis.  I do note that three paragraphs of that

22  factual basis -- excuse me.  Paragraph 22 includes three

23  subparagraphs of that factual basis is objected to by the

24  defense.  But as to the rest of the factual basis, which the

25  parties agree to, there is a -- the magistrate found there

1    was a sufficient factual basis for the entry of the three

2    pleas.  This Court affirms the magistrate's finding.  This

3    Court also independently finds there's a sufficient factual

4    basis for the entry of the three pleas of guilty.

5              Now, sir, after you entered your three pleas of

6    guilty, your case was referred to the United States Probation

7    Office for a presentence investigation report.  I'm holding a

8    copy of that report.

9              Have you received a copy of this report?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Have you read it?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  Have you -- do you understand it?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Have you had an opportunity to go over

16   the report with Mr. Davis?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  And has he answered any and all

19   questions you had regarding the report?

20             THE DEFENDANT:  Yes, sir, he has.

21             THE COURT:  All right.  Thank you.

22             I do note there are objections to the report.  The

23   one that directly affects the guidelines calculation is the

24   leadership enhancement, but I -- we will -- we will proceed

25   with going through the objections one by one.

1       Mr. Davis, you can start with whichever -- whatever
2  objection you want to start with.
3       MR. DAVIS:  Thank you, Your Honor.  I think there
4  are two that directly affect the guidelines.  One would be
5  the base offense level.
6       THE COURT:  Right.
7       As to whether the semiautomatic was --
8       MR. DAVIS:  Correct.
9       THE COURT:  -- was in close proximity to the
10  magazine.
11       MR. DAVIS:  Correct, Your Honor.  And then the
12  other one would be the aggravated role objection on that.
13  And I think that is where I would like to focus the Court's
14  attention.
15       I believe that Mr. Savage has some evidence he
16  wants to put on regarding the base level.  So I'll defer to
17  the Court as to how the Court wants to proceed --
18       THE COURT:  Well --
19       MR. DAVIS:  -- procedurally in that regard.
20       THE COURT:  The Government does have the burden of
21  proof on both the issues because they are coming from the
22  probation office.  So why -- if the Government has evidence,
23  then let's have the Government present its evidence first,
24  and then we can hear argument on -- on those two issues.
25       MR. DAVIS:  That makes sense to me as well, Your

MOSS - DIRECT

1  Honor.

2          THE COURT:  Mr. Savage.

3          MR. SAVAGE:  The United States would call Special

4  Agent Mark Moss to testify.

5          MARK MOSS, GOVERNMENT'S WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MR. SAVAGE:

8  Q.    Would you please state your name.

9  A.    Mark Moss.

10 Q.    And, Mr. Moss, how are you employed?

11 A.    By the Federal Bureau of Investigation.

12 Q.    And how long have you been an agent with the Federal

13 Bureau of Investigation?

14 A.    A little more than 20 years.

15 Q.    Okay.  And could you tell the Court a little bit about

16 your experience and background prior to coming into the FBI?

17 A.    Prior to coming into the FBI, I was an Army officer

18 active duty after college.  After completing that military

19 obligation, I went in to a law enforcement -- I was a police

20 officer in Virginia for a few years.  Then I entered into the

21 FBI.

22 Q.    And in the course of your FBI training, did you become

23 familiar with various types of firearms?

24 A.    Yes, sir.  I am a weapons instructor for the FBI for

25 over 19 years.

MOSS - DIRECT

1  Q.   And let me direct your attention to 2015.  Did you -- in

2  fact, on July 17th of last year.  Were you participating in

3  an investigation involving the defendant in this case, Walter

4  Eugene Litteral?

5  A.   Yes, sir, I was.

6  Q.   And could you tell the Court what happened specifically

7  on July 17, 2015, at the Gander Mountain store in Gastonia,

8  North Carolina?

9  A.   Yes, sir.  I was prepositioned in the store along with

10  Special Agent Brian Ropey, and we were to monitor

11  Mr. Litteral as he came into the store and see what activity

12  happened.  While in the store, we -- we witnessed

13  Mr. Litteral come into the store, go to the back of the

14  store, and discuss something with one of the employees of

15  Gander Mountain.  A short time lawyer, an employee brought

16  out a box that said Smith & Wesson on it, and Mr. Litteral

17  examined the contents of the box, which it to be an

18  AR-15-type rifle.  Additionally, I noticed that he examined

19  the magazine that was in the box along with the rifle.

20      A short period of time after that, he moved to a

21  different part of the store, looked like maybe some paperwork

22  going on.  He remained in that area for approximately 30

23  minutes and then he departed the store without the rifle.

24  Q.   Okay.  Is the person that you saw in the Gander Mountain

25  store on the 17th of July 2015 present in the courtroom

MOSS - DIRECT

1  today?

2  A.   Yes, sir, he is.

3  Q.   Would you please point to him and call him by name?

4  A.   He's right here to you -- to my left in the orange

5  shirt.

6           MR. SAVAGE:  Your Honor, would the record reflect

7  that correct identification of the defendant.

8           THE COURT:  So reflected.

9  Q.   Now, Agent Moss, did you have a clear view of the

10 defendant the entire time he was in the Gander Mountain

11 store?

12 A.   For the most part.  I didn't get extremely close to him,

13 but I could see him the entire time he's in the store, except

14 for momentarily when he was moving in between some

15 merchandise.

16          MR. SAVAGE:  Your Honor, may I approach?

17          THE COURT:  You may.

18 Q.   Agent Moss, let me show you what I marked as

19 Government's Exhibit 1.  Do you recognize this -- this box?

20 A.   Yes, sir.  This is the box that contained the weapon

21 that was in the Gander Mountain store.

22 Q.   Okay.  And the same one that you saw the defendant

23 looking at?

24 A.   Yes, sir, it is.

25 Q.   Okay.  How close was the defendant to this box?

MOSS - DIRECT

1  A.   He -- he was with the box in examining the rifle right

2  with it.  He was basically on top of the box.

3  Q.   Did he pick up the weapon and handle it?

4  A.   Yes, sir.

5        MR. SAVAGE:  And I'm opening the box, Your Honor,

6  and I would note that the weapon inside of it has been

7  disabled or has the appropriate safety straps on it.

8  Q.   Could you -- could you pick up the weapon?

9  A.   Yes, sir.

10 Q.   And show us, if you can, the way that the defendant was

11 holding it.

12 A.   Something to the effect like I am now.  He was examining

13 the rifle.

14 Q.   If you could show the Court.

15 A.   (The witness complied.)

16 Q.   Now, is there other items inside this box besides just

17 that weapon?

18 A.   Yes, sir.

19        THE COURT:  Could you verbally described how you

20 just held it for the record.

21        THE WITNESS:  Two-handed, kind of a -- almost like

22 a port arms military.  He was just examining the weapon.

23        THE COURT:  Right.  I think port arms is a good

24 description.  So you can go back to Mr. Savage's question.

25

MOSS - DIRECT

1  Q.   Did he pick up any other items in the box?

2  A.   Yes, sir.  There was a magazine he examined in the box.

3  Q.   Okay.  And could you pick that up and show the Court?

4  A.   (The witness complied.)

5  Q.   Now, you were -- how far away were you standing from the

6  defendant at the time that he was looking at this box?

7  A.   I moved a little bit.  So I would say it varied, you

8  know, 10, 15 yards, somewhere in there maybe.  But I didn't

9  get too close or too far.

10 Q.   Okay.  Well, how could -- could you tell that the item

11 in the box that he was holding besides the rifle was a

12 magazine?

13 A.   Well, yes, sir.  The reason I know this is not only my

14 training with the FBI, but I'm a gun enthusiast in my private

15 time.  These particular magazines are the ones that I

16 purchase personally.  They're very distinctive, and I do

17 recall when I saw him picking it up, I was unaware that Smith

18 & Wesson included that brand of magazine with their guns.

19 Usually they incorporated an inexpensive metal GI-type

20 magazine.  And I was rather impressed that Smith & Wesson

21 included a high-quality magazine by Magpul in with the gun.

22 So me being the enthusiast, I took note of that.

23 Q.   Okay.

24         THE COURT:  It was in that plastic bag though?

25         THE WITNESS:  Yes, sir.

MOSS - DIRECT

1          THE COURT:  But you could -- it's clear on this
2    side, so you could see -- you knew it was --
3          THE WITNESS:  Yes, sir.
4          THE COURT:  You knew it was a magazine?
5          THE WITNESS:  Yes, sir.  It's a distinctive
6    packaging.  Like I said, I'm very familiar with it from my
7    personal experience, but it's also one of three magazines
8    that the FBI allows for its weapons.  So I'm at work and
9    personally experienced with.
10   Q.   If you could just tell the Court for the record, what
11   does it say on the label?  What kind of magazine is that?
12   A.   It's manufactured by a company called Magpul, and it's
13   called a P Mag.  It's a plastic polymer-based magazine, 30
14   rounds.  It says AR M4 generation M2.
15   Q.   Okay.  And this is important for the record.  So this
16   magazine, in your experience, will contain at least 30 rounds
17   of ammunition?
18   A.   Yes, sir.  It's designed to function with 30 rounds of
19   ammunition.
20         THE COURT:  And interchangeable between an AR-15,
21   which is a semiautomatic, and M4 which is burst, correct?
22         THE WITNESS:  Correct.  The M4 has a selector
23   switch to allows it go fully automatic.  But essentially they
24   are the same rifle except for that fact, for the most part.
25   And this is -- this magazine will function in this AR-15-type

MOSS - CROSS

1   rifle or M4 rifle, yes, sir.

2          MR. SAVAGE:  Thank you.  You may be seated.

3   Q.   Now, after the defendant examined the box, what happened

4   next?

5   A.   He moved to a different part of the store with the

6   employee.  It appeared like they were doing some paperwork of

7   some kind.  He remained in that area for quite some time,

8   almost a half an hour.

9   Q.   Okay.

10  A.   And then he departed the store without the rifle.

11  Q.   To be clear, the rifle stayed.  It was put back in the

12  box and taken back behind the counter?

13  A.   Yes, sir.

14  Q.   Thank you.

15          MR. SAVAGE:  No further questions, Your Honor.

16          THE COURT:  Mr. Davis, your witness.

17                      CROSS-EXAMINATION

18  BY MR. DAVIS:

19  Q.   Agent Moss, when Mr. Litteral went to the other part of

20  the store, as you described after examining the rifle, how

21  far away was that from the counter where he had been?

22  A.   I don't know, sir.  Maybe 10 to 15 yards or so.  It's

23  not real far.

24  Q.   And you were watching him during that time?

25  A.   Yes, sir.

MOSS - CROSS

1   Q.   Were you watching the rifle on the counter?

2   A.   I did not watch the rifle on the counter the whole time.

3   I was watching him.  It remained back at the counter.

4   Q.   All right.  And you did not see what the clerks were

5   doing with that box?

6   A.   I saw them put it back behind the counter, but what they

7   did with it, I don't know.

8   Q.   And when was the next time you saw that rifle?

9   A.   The next time I saw the rifle was in the evidence locker

10  of our building.

11  Q.   And how long after -- after your surveillance was that?

12  A.   It was several days after I saw the rifle.  I -- I was

13  not the one that collected the rifle in evidence.

14  Q.   And you said Mr. Litteral filled out paperwork after he

15  had left the counter?

16  A.   It's what it appeared, yes, sir.

17  Q.   Did you see him fill out any paperwork while he was with

18  the rifle?

19  A.   I did not notice that.

20  Q.   Did you ever have occasion to interview the clerks who

21  showed him the rifle?

22  A.   I did not.

23  Q.   So you do not know what they said to him?

24  A.   I do not.

25  Q.   You do not know what he said to them?

1    A.    I do not.

2    Q.    And you don't know what they may have discussed about

3    that magazine being included or not included?

4    A.    I do not.

5    Q.    To your knowledge, Mr. Litteral never actually completed

6    the purchase of that rifle?

7    A.    To my knowledge.

8    Q.    Now, Agent Moss, you also filled out a report regarding

9    the surveillance, correct?

10   A.    Yes, sir, I did.

11   Q.    Okay.  And do you recall saying in that report that he

12   was observed handling magazines, plural?

13   A.    Yes, sir.

14   Q.    Are there more than one magazine in that box?

15   A.    No, sir.

16   Q.    So were there other magazines around when he was looking

17   at the rifle?

18   A.    I don't know.  The magazine was put up and down, and

19   from my vantage point I couldn't tell if it was the same

20   magazine or not.

21   Q.    All right.

22   A.    It might -- it's possible that it was only one magazine.

23   Q.    And it's possible that there were multiple magazines

24   there?

25   A.    Possible.

MOSS - CROSS

1    Q.   At that time did you actually look at the magazine in
2    the box?
3    A.   Only from the vantage point I was.  I didn't want to get
4    very close.
5    Q.   So only when it was in Mr. Litteral's hand?
6    A.    Yes, sir.
7              MR. DAVIS:  Nothing further.
8              THE COURT:  Redirect?
9              MR. SAVAGE:  Nothing from the Government, Your
10   Honor.
11             THE COURT:  All right.  Special Agent Moss, you may
12   step down.
13             Further evidence from the United States?
14             MR. SAVAGE:  Not on the first objection, Your
15   Honor.  Do you want us to proceed to the second or?
16             THE COURT:  No.  Let's deal with them one by one.
17             MR. SAVAGE:  Okay.
18             THE COURT:  Any defense evidence on this issue?
19             MR. DAVIS:  No, Your Honor.
20             THE COURT:  All right.  Then it's defense's
21   argument.
22             MR. DAVIS:  Thank you, Your Honor.
23             The question, of course, is whether this is a
24   high-capacity magazine based on whether at the time of the
25   offense it was in sufficient proximity to a -- to a magazine

capable of carrying other rounds.

The offense in this particular case is the filling out of the forms where Mr. Litteral was, by Agent Moss's testimony, not near the rifle.  It was not in his possession.  By Agent Moss's testimony, we don't know exactly what happened to the rifle after the clerks took it and put it under the -- under the counter.  It doesn't sound like he even particularly observed that terribly closely.  So we don't actually know --

THE COURT:  Do we need -- do we need -- do you need an exact chain of custody, or can you just use the circumstantial evidence of the -- he actually, you know, observed by two federal agents holding this magazine next to the AR-15?  I mean, that's what I'm saying.  Does it have to be a perfect chain of custody, or can it be a chain of -- can it just be a circumstantial chain of custody?

MR. DAVIS:  Well, I guess if the Court is asking what is the burden of proof particularly in regards to this --

THE COURT:  Well, it's preponderance of the evidence.

MR. DAVIS:  Right, exactly.  And so I think that to that extent the Court can make that decision based on the evidence presented.  That said, I do think the Government has to produce evidence that at the time of the actual offense

1  this is -- this is what was happening.

2          What I would submit to the Court is this rifle

3  never -- other than the brief moment of his examination, was

4  never actually in Mr. Litteral's possession.  It certainly

5  was not in his possession at the time he committed the

6  offense, which would be filling out paperwork in this case.

7  It was in the possession of Gander Mountain.  We don't have

8  evidence of what Gander Mountain did or didn't do.  We don't

9  know if Gander Mountain put these -- stored these things

10  separately.  We don't know.  From what Agent Moss said, he

11  couldn't tell exactly how many -- how many clips are going up

12  and down --

13          THE COURT:  Why -- why are you narrowly saying the

14  offense is just knowingly making false statements?  Isn't it

15  all three counts grouped under the guidelines?

16          MR. DAVIS:  They would group, that's correct, Your

17  Honor.

18          THE COURT:  Right.  So the conspiracy is ongoing,

19  and -- and the making of false statement wouldn't -- wouldn't

20  it include the events around the making of a false statement?

21          And finally, aiding and abetting the possession of

22  ammunition by a prohibited person, that's -- that's an

23  ongoing crime here, aiding and abetting, right?

24          MR. DAVIS:  Well, I would submit to Your Honor that

25  at least -- certainly the aiding and abetting I think is the

clearest aspect of this because there's no question that
Mr. Litteral did not have, you know, any -- any ability, any
control, anything near the rifle at the time of the aiding
and abetting of Mr. Barker's purchase.

        THE COURT:  But it is aiding and abetting.  I mean,
the aiding and abetting doesn't mean you have to be standing
right there.  You can do anything to aid and abet.  And if
you do aid and abet, then you become a principal.

        MR. DAVIS:  Yes, but Mr. -- but Mr. Barker's
possession of ammunition was not until days after this
occurred.  I think in that particular regard.

        THE COURT:  Well, you're right.  Yes, I agree with
you there.  The -- specifically the ammo.

        MR. DAVIS:  Right.  And in regards to the
conspiracy, Your Honor, as we've argued to the extent that
the question is -- the issue is that would Mr. Litteral have
ultimately turned over this -- this gun and clip to
Mr. Barker.  At first I do think there's a legitimate
question about whether that actually would have occurred, but
certainly I think he contemplated that it would, that it was
a conditional contemplation.  But at the time Mr. Litteral
believed that those conditions would come to pass, even
though in reality they wouldn't.

        However, the acts to complete Mr. Barker's
possession had not come to pass.  And so to the extent that

1    there's a conspiracy theory liability under 2S1.1 I believe

2    that it's not complete -- sufficiently completed to merit the

3    adjustment.  Or rather, I should say, it would therefore

4    merit a three-level reduction under the conspiracy guideline.

5         THE COURT:  But the conspiracy in this case, the

6    object of this conspiracy was aiding and abetting with a

7    false statement and the possession of ammunition by a

8    prohibited person.  So don't you use 2K2.1 in that case, and

9    371 is -- fall -- 371 violation, a continuing violation based

10   on just an agreement.  Don't you apply 2K2.1, not the 2X

11   series?

12        MR. DAVIS:  You do to the extent that the crime is

13   completed.  Our argument is if you look -- if you're

14   talking -- if you're discussing the crime of making false

15   statement, during that crime there's not -- there is no

16   possession of firearm.  There's no possession of the clip.

17   The physical proximity, our argument is, the physical

18   proximity required for this increase requires some degree of

19   Mr. Litteral's possession and control over the weapon at the

20   time of the offense.  To the extent we're talking about the

21   offense --

22        THE COURT:  See, I think what I'm saying is you

23   keep looking at one offense, the making of the false

24   statement.  And I keep looking at the conspiracy, which is

25   ongoing, and it involved every step, substantial step forward

1    or every overt act, and those overt acts are laid out in the

2    indictment.

3              MR. DAVIS:  Yes, Your Honor.  My argument on that

4    point is to the extent that we are -- the object of the

5    conspiracy is the false statement, I don't believe the

6    conspiracy liability or the time frame for the conspiracy

7    itself can exceed the actual crime itself.  In this

8    particular case --

9              THE COURT:  Which crime are you -- which object are

10   you talking about?  Actually --

11             MR. DAVIS:  If it's -- if it's the false statement.

12             THE COURT:  Well, I disagree with you as a matter

13   of law on that one.  You can -- you can have a substantive

14   crime and it's an overt act in conspiracy, and you can have

15   the conspiracy continuing with a lot more overt acts.

16             MR. DAVIS:  That's correct.  That is definitely

17   true, Your Honor.

18             THE COURT:  All right.

19             MR. DAVIS:  But to the extent that we're talking

20   about the conspiracy continuing to other objectives beyond

21   that, those objectives were not completed.

22             THE COURT:  But they don't -- but conspiracy, you

23   just need agreement.  You don't have to complete any

24   objective.  You just have to have the agreement and an overt

25   act.  You don't have to have an -- objectives are unnecessary

1   as a matter of law.  You just -- the agreement and overt act

2   under 371.

3           In some conspiracies, not applicable here, but

4   other conspiracies don't require an overt act.  But everyone

5   agrees that 371 requires an overt act.

6           MR. DAVIS:  I think for the purposes of 2K2.1

7   enhancement here, the fact that a firearm -- if -- if, at the

8   moment of agreement, that is the question of proximity is at

9   the moment of agreement in proximity --

10          THE COURT:  I don't -- I don't -- what's your case

11  law saying that you take a whole conspiracy that takes a lot

12  of overt -- that intends to have a lot of overt acts and you

13  narrow it down to one overt that's tied specifically to one

14  substantive crime?  You have -- you have any case law that

15  supports that?

16          MR. DAVIS:  There is virtually no case law on this

17  enhancement in this context, Your Honor.  So, no, I do not.

18  But I --

19          THE COURT:  Well, no, I'm not talking about -- I'm

20  not talking about this set of facts.  I'm saying period.

21  That say you have four objects of a conspiracy and each of

22  those is a separate substantive crime, it seems to me you're

23  saying that you break a conspiracy up into four little

24  conspiracies, each tied specifically to a -- the -- each of

25  those objects each as a substantive crime.  That sounds like

1    what you're doing here.  Instead of saying that a conspiracy,

2    just as long as there's agreement, it keeps going.  And --

3    and unless you affirmatively withdraw, once you're in you're

4    in.

5         MR. DAVIS:  Yes, Your Honor.  And I -- my point is,

6    I don't think that it is a fair application of 2K2.1 to say

7    that because though you could not have -- that you would not

8    receive this enhancement at the time of the crime that is

9    point of conspiracy A and you have not completed the point of

10   conspiracy B, you can be enhanced while not receiving the

11   reduction.  You can be enhanced under the guideline section

12   that applies to the first crime while not receiving the

13   reduction for the second.

14        So I think either the conspiracy law has to look at

15   the actual crime that is being enhanced, which would be the

16   false statement crime, and fall under the same rules as that,

17   or it has to look at the entirety of the conspiracy in which

18   case it was not completed and, therefore, there's a

19   reduction.

20        THE COURT:  Well, he -- he did not plead guilty

21   to -- well, I'm sorry.

22        Well, he -- one -- one of the objects of

23   conspiracy, of course, is the 922(a)(6), the -- making the

24   false statement.  And, I mean, I guess I'm not following what

25   you're saying because I'm looking at conspiracy as it's

1   ongoing, and you're saying that you have to look narrowly at

2   one overt act because if you used the 2X series, then you

3   would have a reduction because it's a conspiracy.  Right?  A

4   two- or three-level -- what is it?  Three levels?

5           MR. DAVIS:  Three-level reduction.

6           THE COURT:  But -- but doesn't that then just make

7   a nullity out of the close proximity issue, and you just kind

8   of preliminary eliminated it?  And how do you eliminate

9   something that is very specific?  Close proximity of the

10  magazine to the rifle.

11          MR. DAVIS:  Well, I think I -- I think -- allow me

12  to try and simplify it a different way, Your Honor.

13          Under -- under the 922(a)(6) conviction, there's --

14  the question I think before the Court is, was this in close

15  proximity at the time of the commission of that offense.  So

16  was it for purposes of the guidelines.

17          If the answer to that question is "yes," then, of

18  course, that's the end of the debate.  If the answer to that

19  question is "no," then the question is, would the conspiracy

20  scoop it in.

21          And my argument to the Court is the fact that a

22  conspiracy is ongoing to a different objective could,

23  therefore, cause you to enhance one part of the conspiracy

24  that can't be enhanced independently of that.  You can't

25  basically scoop in that enhancement.  You would miss under

1    the conduct, that's the conduct that that's object of the

2    conspiracy, and slap it on to conduct that otherwise wouldn't

3    be subject to that enhancement because when that -- that

4    second conduct was not completed.

5          You basically can't add that back on when it

6    wouldn't be on (a)(6) itself unless you looked to the

7    additional goals of the conspiracy.  And if you looked to

8    those, you have to say those weren't completed and reduce it

9    by three levels.

10          That's our argument.

11          THE COURT:  All right.  I -- I don't recall you

12   ever citing any case law -- right? -- on this issue.

13          MR. DAVIS:  As I said to the Court before, I don't

14   believe there's any particular case law.

15          THE COURT:  All right.

16          MR. DAVIS:  We did cite to case law regarding --

17   regarding the 2X reduction and that aspect of things.  I

18   assume that's not what the Court is referring to.

19          THE COURT:  No.

20          MR. DAVIS:  I can elaborate further on it.  There's

21   certainly case law.

22          THE COURT:  All right.

23          Mr. Savage.

24          MR. SAVAGE:  Your Honor, to clarify.  And this

25   logic is completely circular.  In Document No. 44 in

1    Government's response to the defendant's objection --

2            THE COURT:  I have that.

3            MR. SAVAGE:  -- if you go to page -- actually,

4    well, our response starts on -- the applicable law starts on

5    3, but it lays out the applicable guideline provisions.  The

6    Court has it exactly right.  I mean, the defendant wants to

7    plead guilty to one -- wants you to sentence him on one count

8    and he pled guilty to three.  The Government didn't include

9    and didn't insist on that conspiracy count for no reason at

10   all.  But for the intervention of the FBI that prevented this

11   gun from being delivered because it would not give the

12   completion on the background check the defendant would have

13   -- would have purchased this gun.  The object of the offense

14   was him to purchase it for Mr. Barker.  He would have

15   delivered it to Mr. Barker, which is the object of the straw

16   purchase because he didn't purchase it himself.

17           The guideline that applies, this business about you

18   can't have it and slap it and take it back is ridiculous.  I

19   mean, the fact of the matter is it's a conspiracy.  Under

20   2X1.1, you go to the base level.  It cross-references to the

21   underlying offense.  You pick up the underlying offense and

22   it's specific offense characteristics.

23           So you go to 2K2.1.  You look and see that this guy

24   is buying a mag -- that -- he knows that Mr. Barker is a

25   convicted felon because he tells his friend.  He also knows

1   he's an addicted -- he's addicted to Oxycodone because he's
2   selling it to him.  He says that in his confession.  He knows
3   it's an AR-15 because he picks it up.  He helps pick it out.
4   Mr. Barker gives him $700 to buy it ahead of time.  He knows
5   it has a magazine in it because he picks it up.
6            More than that, shown on Exhibit 1, the Smith &
7   Wesson, when you go to buy this particular gun it says in its
8   description that it includes a 30-round P Mag magazine with
9   it, which is part of the Government's -- I marked this as
10  Government's Exhibit 2, but it's Attachment No. 1 to our
11  Document 44, which is our response.
12           So all of that occurred.  The fact that it wasn't
13  actually delivered, you then get to the specific offense
14  characteristics.  And the defense objection, their alternate
15  argument is, Okay, because the offense wasn't completed, you
16  need to give him three levels, which is I think what the
17  argument is here.  However, if you look at the --
18           THE COURT:  The three-level reduction?
19           MR. SAVAGE:  Right.
20           THE COURT:  Right.
21           MR. SAVAGE:  But if you look at the background note
22  to 2S1.1 and that application of that 2S1.1(b)(2), it says,
23  In most prosecutions for conspiracy, the substance offense
24  was substantially completed or was interrupted or prevented
25  on the verge of completion by the intercession of law

1    enforcement authorities or the victim.  In such case, no
2    reduction of the offense level is warranted.

3         The only reason this conspiracy wasn't completed
4    was because the FBI had a wire up, knew he was in the place,
5    was following him and didn't let him buy the gun.  Otherwise,
6    the entire thing would have been completed.  It would have
7    been delivered to Mr. Barker.

8         And that, by the way, if Mr. Davis is arguing that
9    it wasn't Mr. Litteral's intent to actually deliver it, then
10   we've got a problem with acceptance of responsibility and
11   wonder why it is that he pled guilty to these offenses.
12   Because if you look at the plea -- if you look at the factual
13   basis in the plea agreement, it is clear that if you look in
14   paragraph 13(c) of the factual basis, it says, quote,
15   Litteral knew and intended that his offense of making a false
16   statement to purchase a firearm for Barker would result in
17   the transfer of a firearm to a prohibited person.

18        That was the whole purpose of this conspiracy, is
19   to arm these people because of Jade Helm and Armageddon and
20   the president was coming to take their guns.

21        THE COURT:  And that -- Jade Helm is the name of
22   the operation, right?

23        MR. SAVAGE:  Yes, that was happening not in
24   North Carolina, but 1,000 miles away in Texas at the same
25   time.  But which is, as the Court might be aware, the subject

1 of all sorts of conspiracy theories on the internet, and that

2 sort of thing about which Mr. Barker --

3        THE COURT:  Just note for the record, the Court is

4 not aware of that.

5        MR. SAVAGE:  I'm sorry.

6        THE COURT:  Seriously.  The Court did not Google

7 Jade Helm.

8        MR. SAVAGE:  Okay.

9        THE COURT:  That would probably be inappropriate

10 for a finder of fact --

11        MR. SAVAGE:  Right.

12        THE COURT:  -- to be looking at the evidence

13 outside the courtroom.

14        MR. SAVAGE:  Well, outside.  Inside the parameters

15 of this, the filed -- the filed pleadings in this case make

16 it clear that Jade Helm was the object of the eyer of

17 Mr. Barker, Mr. Campbell and Mr. Litteral, who were all

18 gathered together to try to arm themselves when this event

19 occurred.

20        So for all these reasons, when we're looking at

21 this particular objection, Your Honor, we would rely on the

22 factual resume, the notes, the comments I just mentioned,

23 2S1.1, the fact that the defendant pled guilty to a

24 conspiracy.  At the time of the conspiracy, which by the way,

25 is alleged in the indictment as including the 17th in the

1    factual resume, the admissions include the 17th.  The
2    indictment alleges that the conspiracy begins I think on
3    March 1st.

4              Let me go to Count One.

5              It alleges that it begins on March 1st, 2015, and
6    continues until at least on or about August 1st, 2015.
7    August 1st, 2015, was the date that we executed the search
8    warrants and the arrest.  The time of the offense includes
9    that entire time as the conspiracy was in operation.  The
10   defendant never withdrew, never repudiated, never said he
11   wasn't going to give the gun.

12             In fact, that same day he talks to Mr. Barker on
13   the telephone in an intercepted conversation and gives him
14   advice on what other kinds of magazines to buy.  And
15   Mr. Barker, to complete his part of the conspiracy, actually
16   buys ammunition, which the defendant has pled guilty to
17   aiding and abetting because he knows he's an addicted person
18   and he knows he's a felon.

19             So for all those reasons, it is clear that at the
20   time of the offense, which was the 17th of July 2015, he
21   possessed and had in his possession and control this Smith &
22   Wesson MP-15 with the 13- -- 30-round magazine that comes
23   with it.  If he didn't, he certainly intended for Mr. Barker
24   to possess it.  And at the end of the day, it would be -- it
25   would be ludicrous to have a MP-15 to defend against the

1    coming of the marshal law without the -- either the magazine

2    that comes with the gun or the magazine that Mr. Barker and

3    aided and abetted by Mr. Litteral was purchasing at the

4    Gander Mountain later that day.

5              THE COURT:  Quick question.  Definition of the

6    semiautomatic firearm.  I know the Government is proceeding

7    on the in close proximity.  Are you proceeding on the

8    alternative that the firearm had attached to it a magazine or

9    similar device?

10             MR. SAVAGE:  I have no evidence, Your Honor, that

11   at any other time that the magazine would have been attached.

12             Clearly --

13             THE COURT:  It's reasonable to presume sometime it

14   was attached, but you don't have any direct evidence of that.

15             MR. SAVAGE:  No.  Your Honor, I think that the

16   clear -- by a preponderance I think this Court would

17   certainly be legitimate in finding based on all the facts and

18   circumstances surrounding around this conspiracy that it was

19   the intent of the parties that at some point in time it be

20   attached because they intended to use it.  I mean, a gun is

21   worthless without bullets.  So, I mean, I don't think they

22   were going to club people with it.

23             THE COURT:  Well, actually some guns are designed

24   that way.

25             MR. SAVAGE:  Well, that's true.

1          THE COURT:  You run out of ammo, you turn it into a
2    clubbing device.

3          MR. SAVAGE:  Well, there was no indication that
4    they wanted a MP-15 because it made a good baseball bat.

5          THE COURT:  No.  These weapons are usually not
6    designed that way.

7          MR. SAVAGE:  Right.  Otherwise, Mr. Barker wouldn't
8    have been doing his own shopping for ammunition.  He bought
9    100 rounds and he bought another magazine to fit this gun.
10   So it had two.

11         THE COURT:  Actually, I take that back.  The old
12   M16s, which, of course, the AR-15s are designed after, did
13   have bayonets.  They were designed for purposes beyond --
14   when you ran out of ammo, you had a bayonet.

15         MR. SAVAGE:  Having no experience on that, Your
16   Honor, I'd certainly defer to the Court on that one.  So --

17         THE COURT:  So anyway, that's not an issue today.
18   It's the question of the proximity of the magazine.  All
19   right.

20         One minute of rebuttal.

21         MR. DAVIS:  Yeah.  One minute and one minute only,
22   Your Honor.

23         Two very quick things.  First of all, I think that
24   the Court will see that the evidence is that Mr. Barker did
25   not want this gun to prepare for Jade Helm and that is not a

1    correct statement of the evidence.

2           Second of all, to the extent it is relevant to the

3    Court's analysis in this particular objection, there is clear

4    case law that this would not -- that the fact that -- whether

5    or not Mr. Litteral actually intended to at some point give

6    this to Mr. Barker, not enough steps had been completed to do

7    that under 2S1.1.

8           THE COURT:  Then why did he plead to conspiracy?

9           MR. DAVIS:  Well, no, no.  It's not the conspiracy

10   plea.  The conspiracy itself is completed.

11          THE COURT:  All right.

12          MR. DAVIS:  The question is under the -- for the

13   three-level reduction under 2X1.1, and there is a case, *U.S.*

14   *v. Soto*, which is cited in our brief.  It's an Eighth Circuit

15   which is very on point.  The defendant there was stopped with

16   a large amount of ammunition in his trunk.  He told the

17   authorities he was taking it or he intended to take it to

18   someone he called Compadre, who would then smuggle it across

19   the border.  He just wasn't on his way to do it at that

20   particular moment.

21          And the Eighth Circuit found that is not sufficient

22   to say that they interrupted it right before it was completed

23   because there was still a number of intervening acts that he

24   would have had to perform in order to get that ammunition to

25   Compadre.  They had no evidence that he was going to

1    immediately deliver it to Compadre.

2         THE COURT:  Except that's not the facts here.

3    The -- he actually was going to purchase it until the FBI,

4    NICS said no.  So --

5         MR. DAVIS:  And --

6         THE COURT:  So he was up to the point of the

7    purchase, and it was stopped by the FBI because they have a

8    national system for checking it.

9         MR. DAVIS:  And --

10        THE COURT:  So it was to the point where everything

11   was done.  Otherwise, you wouldn't have sent it off to the

12   FBI.

13        MR. DAVIS:  In terms of the purchase, Your Honor is

14   correct.  In terms of delivery to Mr. Barker to the extent

15   that as part of this Court's analysis, I don't think that

16   that's correct.  I think that that is actually very

17   analogous.  The evidence here is that he was going to go

18   straight home after he purchased the firearm.

19        So to the extent that the actual getting it into

20   Mr. Barker's hands as a part of the analysis here, the intent

21   to do that in *Soto* would apply.

22        THE COURT:  Well, isn't the -- just the intent is

23   all you need, right?  That the intending to turn it over?

24        MR. DAVIS:  Well, under 2X1.1 that's not correct,

25   Your Honor.  Under 2X1.1 the three-level reduction applies if

1  you have not completed all of the necessary steps, except

2  when the Government intervenes on the verge of doing so.

3          THE COURT:  Right.

4          MR. DAVIS:  So to the extent what we're talking

5  about is the delivery to Mr. Barker, there is zero evidence

6  that Mr. Litteral had any actual active plans to put it in

7  Mr. Barker's hands.

8          Now, the intent that ultimately -- whether it was

9  before or after bad things happened, whether Mr. Litteral

10  would store it in his gun safe for Mr. Barker or not, he

11  absolutely has admitted to that.  But what is absent is the

12  same thing that was absent in *Soto*.  The actual active act of

13  plans to go and deliver this to Mr. Barker.  It didn't have

14  that.  They had made no such plans.  It was -- it's clear

15  that Mr. Litteral's plan was that he was going to go back to

16  his house.  There was discussion of storing it.

17          THE COURT:  But --

18          MR. DAVIS:  So to that -- to the extent that is a

19  part of the Court's analysis, then I think *Soto* is directly

20  on point.

21          THE COURT:  Mr. Savage, quick response on that.

22          MR. SAVAGE:  Well, Your Honor, it's a red herring.

23  I mean, the deal is he made a straw purchase.  He admitted

24  it.  I mean, he has it in the factual resume and he admitted

25  that he made a straw purchase.  So we're looking at 2K2.1(1).

1  If the offense involved, it doesn't say it had to be

2  delivered.  I mean, it's a straw purchase.  The offense

3  involved a semiautomatic firearm that is capable of accepting

4  a large-capacity magazine, number one.

5        And the person was prohibited and -- and was

6  basically and is convicted under 18 U.S.C. Section 922(a)(6)

7  or 922(a)(1)(a), which is present here, and committed the

8  offense with knowledge or reason to believe the offense would

9  result in a transfer of a firearm or ammunition to a

10  criminated person.  That's what he pled guilty to.

11        THE COURT:  Reasonably believed.

12        MR. SAVAGE:  Yeah, right.  He pled guilty to this.

13        Now he wants to parse it out and say, oh, I was

14  never going to give it to him.  Then why plead guilty?  I

15  mean, it's actually -- now he's repudiating acceptance of

16  responsibility.

17        THE COURT:  Yeah, I agree with you on that.  It's

18  inconsistent with his plea.

19        MR. DAVIS:  I completely disagree, Your Honor.  He

20  pled guilty to the crime -- the possession of the firearm

21  here, legal possession would include ownership.  We're

22  talking about physical possession by Mr. Barker.  Our

23  argument is directed at physical possession.  He absolutely

24  was buying the gun so that Mr. Barker would legally possess

25  it, would legally own it, and would have the ability to get

1  it in the event that this --
2        THE COURT:  But --
3        MR. DAVIS:  -- happened.
4        THE COURT:  -- but you -- your client has admitted
5  to aiding and abetting the possession.
6        MR. DAVIS:  Yes.
7        THE COURT:  So that's a done crime.  That is
8  100 percent completed.  Without turning it over, right?  Your
9  client didn't turn it over, but he admitted to the crime of
10  aiding and abetting the possession, because he did.  He
11  completed the crime when he purchased the firearm with the
12  intent to -- as a strawman he aided -- he -- that crime was
13  complete because he was just an aider or abettor.
14        MR. DAVIS:  Right.  But that -- he pled guilty to
15  aiding and abetting possession of ammunition by Mr. Barker,
16  which would be the ammunition Mr. Barker purchased.
17        THE COURT:  All right.  I'm sorry.  You are correct
18  about that.  I'm sorry.
19        But still, that's -- that's also still -- well,
20  okay.  I say that's a completed crime.
21        Let's go back to if he knowingly made a false
22  statement.  That's clearly with regard to just the AR-15.
23        MR. DAVIS:  Yes.
24        THE COURT:  And that was completed, right?
25        MR. DAVIS:  That was completed, Your Honor, yes.

1      THE COURT:  Okay.  So why isn't that enough to say

2 that that's a clear object of the conspiracy and that was

3 completed, right?  It was beyond -- it was beyond just on the

4 verge of completion.  That was completed.

5      MR. DAVIS:  Yes, Your Honor.

6      Our argument is if the enhancement for the

7 high-capacity magazine is to be a part of the conspiracy

8 charge.

9      THE COURT:  Right.

10      MR. DAVIS:  Then that has to -- then it has to

11 necessarily be a part of the making a false statement charge

12 as well.  And it would -- what the Court has heard

13 testimony-wise is not sufficient to uphold that enhancement.

14 That's the entirety of our objection.

15      THE COURT:  All right.  The Court overrules the

16 objection.  The Court finds as a matter of fact, after

17 observing the actual weapon it's turned over from Gander

18 Mountain to the FBI, that the -- the magazine itself was in

19 the -- the box that contained the AR-15; therefore, was in

20 close proximity to the firearm as required under the

21 definition of semiautomatic firearm in commentary Application

22 Note 2 of 2K2.1.

23      It's -- it's logical what Mr. Savage was saying

24 with regard to the other alternative under the definition of

25 semiautomatic firearm, that at some point the magazine or

1    similar device that can accept more than 15 rounds of ammo
2    was attached, but I don't have any evidence, direct evidence
3    on that.  We just have that it's logical they were going to
4    do that.  And so I am not finding the alternative in this
5    case.
6            I am finding the magazine that could accept more
7    than 15 rounds was in close proximity to the firearm.  So
8    that's paragraph 2B.  The Court is sustaining the presentence
9    report on that.
10           Paragraph 2A, the Court is not finding that because
11   of the lack of direct evidence and just, you know, there
12   isn't sufficient evidence in the record in the Court's
13   opinion about the preponderance of the evidence of that
14   alternative.
15           MR. SAVAGE:  Your Honor, the Government would also
16   ask for the Court to find as matter of fact and for purposes
17   of this record with respect to this whole transfer and
18   possession argument.  I would note the factual findings and
19   admission in paragraph 13(c) of the factual resume in that
20   Mr. Litteral, the defendant in this case, knew and intended
21   the offense of making a false statement to purchase a firearm
22   would result, intended it would result in the transfer of the
23   firearm ammunition to a prohibited person, which in this case
24   is Mr. Barker.  I mean, there's plenty of evidence on the
25   record that he wasn't simply going to just keep it in his

```
 1    house forever.  He was going to transfer it to Barker, which
 2    is part and parcel of this offense.  And he's also admitted
 3    it in paragraph 13(c).
 4              THE COURT:  All right.  So noted.
 5              MR. SAVAGE:  Thank you, Your Honor.
 6              All right.  That's the ruling on the first
 7    objection to the guidelines calculation.
 8              The second one is a role in the offense.
 9              The probation office found that a two-level
10    enhancement should apply because the defendant -- the
11    defendant was an organizer or leader, manager, supervisor.
12              Mr. Davis.
13              MR. DAVIS:  Yes, Your Honor.
14              First of all, I would point out that -- that in
15    sustaining or upholding that enhancement, the probation
16    office did that on the basis of saying that things were in
17    the factual basis that aren't actually in the factual basis.
18    I mean, it was in part because he directed Mr. Barker to
19    purchase ammunition, which the factual basis says they
20    discussed the purchase of ammunition, not anything -- nothing
21    about direction.  And it says that in the factual basis he,
22    you know -- that basically he told Mr. Campbell how to create
23    a grenade, which in addition to not being true, is also --
24    Mr. Campbell is not even mentioned in the factual basis.
25              THE COURT:  Well, is the Government limited to the
```

1  factual basis?

2          MR. DAVIS:  The Government is not.  I just wanted

3  to point out to the extent that probation's finding on that

4  carries weight, that its finding is based on facts that were

5  not actually in effect based as reported.

6          THE COURT:  Right.

7          MR. DAVIS:  Now, the question is what -- what would

8  sustain an enhancement here?  What is there that could

9  sustain a leadership role enhancement here?  In the

10 Government's response to our objections, they cited to three

11 things, which are essentially very close to what probation

12 cited.  The first of those being advice about ammunition to

13 Mr. Barker.  Now, even in this courtroom not that long ago,

14 Mr. Savage referred to this as "advice."

15         The Fourth Circuit requires that there be a degree

16 of authority or control.  Now, the reality is that -- that

17 this mostly relates to a single conversation that Mr. Barker

18 and Mr. Litteral had.  Now, that conversation does reflect

19 that there was a conversation previously.  But in that,

20 Mr. Barker contacts Mr. Litteral by a text message.

21 Mr. Litteral calls him back.  At that point, before that

22 conversation happened, Mr. Barker had already purchased the

23 ammunition.  So it seems kind of ridiculous that -- even the

24 idea that Mr. Litteral would have advised him to go back in

25 time to purchase the ammunition.

1          Second of all, even throughout that I think it is

2     relatively clear that it is a recommendation essentially if,

3     you know -- if -- if I were to say, you know, I'm interested

4     in learning about sailing, could the Court give me -- could

5     the Court tell me, you know, what -- what should I get for a

6     sailboat.  And the Court were to give me a recommendation

7     about that, would say I think you should get this or, you

8     know, you should get this, the Court did not become the

9     leader or organizer of -- of my sailing interests.

10         And I think what all of this stems from is that a

11    core misperception about Mr. Barker's role in this offense.

12    Mr. Barker spoke to the Government after his arrest at

13    length.  He gave a lengthy confession.  And though, at first

14    he was a little bit evasive, ultimately he was very, very

15    forthcoming, and the Government has acknowledged that he was

16    forthcoming and truthful during his confession.

17         And in that, Special Agent Kozen asked him, Where

18    did you get this idea to get a gun?  Did it come from a

19    conversation you had with Mr. Litteral?

20         And Mr. Barker said, No.  He said, I just wanted

21    one.  I wanted one for safety.  I wanted one for security.  I

22    wanted one to protect my family.

23         He made the decision that he wanted to get a gun

24    and then he contacted Mr. Litteral and asked Mr. Litteral to

25    do, what was in his words, a "favor."  And that's reflected

1   throughout.  It's reflected in what Mr. Barker then said

2   about why he thought Mr. Litteral couldn't get the gun.  He

3   told the agents, yeah, he told me he got denied, but I

4   figured he just didn't want to deal with it.  I figured he

5   just didn't -- didn't -- he got cold feet and didn't want to

6   go through with it.

7            This is not the mind-set that you have when you're

8   being instructed by somebody.  You don't think, Well, you

9   know, when I asked them to do a favor for me and they decided

10  they just don't feel like doing it.  And -- and I think

11  that -- that issue, though, that's about the purchase of the

12  firearm.  I think that misperception, the idea that

13  Mr. Litteral somehow told Mr. Barker that he needed to go out

14  and get a gun, which Mr. Barker said in a confession, which

15  the Government has endorsed as being truthful, he said no, he

16  didn't.  This didn't come from a conversation with

17  Mr. Litteral.  I just decided I wanted this.

18           THE COURT:  All right.  Let me hear from Mr. Savage

19  on this.

20           MR. SAVAGE:  Yes, Your Honor.  We would again rely

21  on our motion.  I mean, first of all, I don't dispute the --

22           THE COURT:  Honestly, I'm having some problems with

23  this.

24           MR. SAVAGE:  No, I understand.  I understand.

25           THE COURT:  Because we're really talking about

1 three people, and it doesn't -- clearly doesn't have the type

2 of hierarchy, you know, that 20 or 30 people in a conspiracy

3 might have.

4 MR. SAVAGE: Yeah, no. It's not -- it's not --

5 he's not the, you know, the Medellín Cartel here. And we're

6 not alleging that. And I think that -- and I don't dispute

7 what the defense, Mr. Davis, is saying here. And I don't --

8 neither do I think, as the defense says in his brief, that we

9 misrepresented the facts. I think that's a bit -- that's a

10 bit harsh. But I do think that there are three instances

11 that support this, or at least two instances. Let me go back

12 to that.

13 First of all --

14 THE COURT: Well, I've got -- I've got your

15 memorandum.

16 MR. SAVAGE: Yeah. And we're going to rely on our

17 argument here on page 8. I'm happy to call Agent Gornozio to

18 substantiate this. And you're right, Your Honor. We're

19 relying on not just the offense conduct with regards to the

20 gun straw purchase and the ammunition, but we're relying on

21 the -- the overall relevant conduct in this case.

22 THE COURT: See, I'll tell you one thing that

23 troubles me is that Mr. Litteral to me seems more like a drug

24 pusher than a drug organization head. And that's --

25 that's --

1          MR. SAVAGE:  Well, it certainly --

2          THE COURT:  It's someone --

3          MR. SAVAGE:  Right.

4          THE COURT:  -- that is finding vulnerability of

5    Mr. Barker and passing him prescription drugs that are not

6    prescribed to Mr. Barker.  I don't -- I don't view that as a

7    supervisor.

8          MR. SAVAGE:  No, you're right, Your Honor.  I think

9    the case that lays this out is *Steffen*, which is at 741 F.3d

10   411.  I think the defense makes a legitimate point.  I mean,

11   you have to be more than just an adviser.  You have to be --

12   you have to exercise some control or direction over it.

13         *Steffen*, the guy was -- the defendant was a -- I

14   believe he was a -- some sort of police officer in South

15   Carolina, and he was -- he was protecting a ring of people

16   that was distributing marijuana plants and some other kinds

17   of drugs.  The Court in that case, the Fourth Circuit, found

18   that he was a manager in there because he was operating and

19   controlling the fact that people can get caught or not get

20   caught.

21         In this particular case, we think that the control

22   with regards to Mr. Campbell and Mr. Barker occur with

23   regards to the relevant conduct, which is the making of the

24   manufacturing of explosive devices.  It's clear from the

25   evidence that was in the complaint and in the indictment

1    that -- and we're happy to put on additional evidence, that

2    Mr. Litteral was directing Mr. Barker on what pipes to get,

3    what kind of explosives.  He was talking to --

4              THE COURT:  Well, and I understand what you're

5    saying.  I think it does seem to be sufficient evidence in

6    the record that he was giving instructions.

7              MR. SAVAGE:  Yes.

8              THE COURT:  Once, again, an instructor is -- is not

9    necessarily a leader or supervisor.

10             MR. SAVAGE:  I understand, Your Honor.

11             THE COURT:  Yeah.

12             MR. SAVAGE:  The other instance we would point out

13   is not only was he selling drugs to Mr. Barker, but he was

14   also trying to sell drugs or getting drugs to Mr. Campbell --

15             THE COURT:  Right.

16             MR. SAVAGE:  -- to sell in his shop.  So those are

17   the two things --

18             THE COURT:  And I agree with you.  I think the

19   evidence supports that.

20             MR. SAVAGE:  Right.

21             THE COURT:  But I also think it was not as a leader

22   or supervisor, but -- because he needed money.  He was having

23   financial --

24             MR. SAVAGE:  There you go.

25             THE COURT:  Mr. Litteral was having serious

1  financial problems and he was selling prescription drugs.

2          MR. SAVAGE:  We certainly respect the Court's view.

3  The Government doesn't see it that way, but that would be the

4  evidence we present.

5          THE COURT:  All right.  I do think it's a close

6  call.  It's a tough one.  Close calls go to the non-moving

7  party.  In this case -- when I say "non-moving party," I

8  should say the party that is trying to -- that is objecting

9  to an enhancement.  The party that's supporting the

10  enhancement has got the burden of proof.

11          So the Government has got the burden of proof on

12  this.  It's a close call.  Tie goes to the defendant.  So I'm

13  striking the two-level enhancement for organizer, leader,

14  manager or supervisor, which changes the total offense level

15  to 17.

16          Is that right?

17          MR. SAVAGE:  Yes, Your Honor.

18          MR. DAVIS:  Yes, Your Honor.

19          THE COURT:  Okay.

20          All right.  Any other objections to the guidelines

21  calculations?

22          MR. DAVIS:  No, Your Honor.  We have our

23  outstanding motions for departure, but obviously --

24          THE COURT:  All right.  17 offense level, criminal

25  history category I, range of 24 to 30 months?

1          MR. SAVAGE:  Correct, Your Honor.

2          THE COURT:  All right.  Thank you.

3          All right.  Mr. Davis, you may proceed.

4          MR. DAVIS:  Thank you, Your Honor.

5          I'll start with our motions for downward departure.

6 Actually, I'm not going to do that.  I'm going to start with

7 something slightly different because I do think it's

8 important to talk about the offense a little bit more at this

9 point because I think there are a couple misperceptions that

10 do need to be corrected.

11          I don't take issue necessarily with the Court's --

12 with the Court's language and analysis regarding

13 Mr. Litteral's pills.

14          THE COURT:  Well, but he was -- he's a drug

15 distributor, and it sounds like he was taking advantage of

16 Mr. Barker's addiction.

17          MR. DAVIS:  That last part is what I do take some

18 issue with, Your Honor.  And -- or at least I take some issue

19 with the concept of Mr. Barker as being this vulnerable

20 person who was snared in.  Because throughout his interview

21 on multiple occasions Mr. Barker told the agents that he was

22 doing things such as getting pipes from Mr. Litteral because

23 he wanted to get into Mr. Litteral's good graces so he could

24 make Mr. Litteral believe he was his friend.  And then he got

25 to meet Mr. Litteral because he wanted --

1           THE COURT:  Aren't you being really inconsistent

2   here?  You just opposed this supervisor, leadership

3   enhancement, and now you're saying Mr. Barker is trying to

4   develop a closer relationship with someone that it sounds

5   like he's seeking leadership from Mr. Litteral.

6           MR. DAVIS:  No.

7           THE COURT:  It sounds a little inconsistent.

8           MR. DAVIS:  No, Your Honor.  He wasn't seeking

9   leadership; he was seeking pills.  It's very clear what he

10  wanted.

11          THE COURT:  Okay.

12          MR. DAVIS:  He wanted pills.

13          THE COURT:  Well --

14          MR. DAVIS:  And that's the point.

15          THE COURT:  Okay.

16          MR. DAVIS:  And the point is certainly Mr. Litteral

17  sold him the pills.

18          THE COURT:  He was selling them because he had an

19  addiction though.

20          MR. DAVIS:  That may have been his motivation

21  without a doubt.

22          THE COURT:  Yeah.

23          MR. DAVIS:  That may have been his motivation

24  without a doubt.  I don't take issue with that.  I don't take

25  issue at all with that idea that Mr. Litteral sold him pills

1 and he should not have. He certainly has admitted that and

2 taken responsibility for.

3     THE COURT: And he made several thousand dollars.

4 I read $5,000 or something like that somewhere in one of

5 these multiple pleadings in this case.

6     MR. DAVIS: To be honest, I do not know that.

7     THE COURT: It wasn't -- it wasn't -- it wasn't one

8 or two or three pills.

9     MR. DAVIS: That's correct.

10     THE COURT: It was a substantial amount of pills

11 over an extended period of time.

12     MR. DAVIS: That's correct. And he's taken

13 responsibility for that. I certainly think we would have a

14 lively debate about numbers if that were an issue in this

15 case, but it really isn't.

16     But I do think there's a concept and a notion that

17 Mr. Barker here was, you know, some sort of innocent addict

18 who just got sucked into this whole behavior and then

19 Mr. Litteral was forcing a gun on him and telling him to go

20 do all sorts of stuff. And that's just not accurate.

21     THE COURT: Well, I -- the second part, I agree. I

22 don't think he was forcing a gun on him. I think he was

23 buying a gun for him as a strawman.

24     MR. DAVIS: Right.

25     THE COURT: They -- they -- you know, whatever

their ultimate intent what is -- is relevant to this hearing
today, but the three crimes of conviction aren't dealing with
the ultimate purpose of possessing the --

          MR. DAVIS:  That's right.

          THE COURT:  -- AR-15 and the MP-5.

          MR. DAVIS:  That's correct, Your Honor.

          And from Mr. Barker's perspective, that purpose was
that he wanted a gun to protect himself.  He is not a
believer in marshal law.  He was not a believer in Jade Helm,
according to the interview he gave to -- to the police, which
I believe at that point in the interview he was being pretty
open and forthcoming with everything.  I don't think the
Government has ever questioned that at this point.

          You know, he --

          THE COURT:  They might question that.  We'll see.
I don't know.

          MR. DAVIS:  On the record, Mr. Savage has said that
he was fully open and forthcoming and honest at that point
when he was saying that, you know, he was doing this for the
pills.  That's why he gave -- that's why he brought pipes
that were not effective, and I think that that's true.

          And I think there's an extent to which, you know,
Mr. Barker is not the person being sentenced here.  I think
there's an extent to which that cuts in his favor.  But I
think it's also an extent to which it cuts against him, and

1 that does play into our motion for departure. And that is --
2 I think when you consider the relative positions of people
3 and how we got here, the question that might be pertinent in
4 regards to Mr. Barker is, you know, what -- what type of
5 person looks at this situation, looks at this person who
6 they're claiming up through the end is their friend and
7 doesn't say, Hey, you know, it looks like your PTSD is
8 getting a little out of control. Because Mr. Barker
9 certainly thought he had it, and many, many doctors agree.
10 Hey, this is a little overboard. Maybe you ought to get some
11 help.

12        And we talk about, Well, Mr. Litteral should have
13 cut Mr. Barker off. Certainly he should have. No question
14 about it. And while Mr. Barker did say that Mr. Litteral was
15 trying to help him, we think the Government would very
16 accurately point out it's not much help when you're selling
17 drugs. On the other hand, I would point out you do not
18 really go in for a lively drug business if you're encouraging
19 your customers to quit.

20        But -- but be that as it may, you know, certainly
21 Mr. Litteral should have done more there. But by the same
22 token, Mr. Barker was using him too. Mr. Barker was using
23 him very much.

24        THE COURT: Well, certainly as a strawman.

25        MR. DAVIS: Yes. Certainly as a strawman.

1          THE COURT:  Absolutely.  I mean, he --

2          MR. DAVIS:  Certainly as a strawman.

3          THE COURT:  Right.

4          MR. DAVIS:  And I think that that's something

5     that -- that shouldn't be ignored.  And I think Mr. Litteral

6     takes responsibility for his actions, but there's a lot of

7     ambience of this case.  A lot of what he wasn't convicted of,

8     which has -- which is not really an accurate picture.  I

9     think that's what the Court has to --

10          THE COURT:  I understand that, and the Government's

11    not using that per se for the hearing today other than to say

12    there -- we have this -- some evidence off of the wiretaps

13    that suggests that as well as -- I don't know whether or not

14    their initial evidence for the wiretap was.  But it's --

15    it's -- the Government's permitted to say this is the motive

16    for a straw purchase.

17          MR. DAVIS:  Of course.  Of course.

18          THE COURT:  Right.  But I guess -- I guess one of

19    the things that troubles me today is exclude military

20    operations, training operations in Texas and just look at the

21    fact that Mr. Litteral knew Mr. Barker had a serious drug

22    addiction and knowingly went and attempted to purchase a

23    firearm for him knowing the drug addiction, not -- not merely

24    that he was a convicted felon, but knowing he was vulnerable

25    as an active drug addict.  And that -- an active drug addict

1   is, of course, a prohibited person in a 922(g).

2          So that -- I -- I am troubled about that.  I am

3   troubled.  And you're right, it's a two-way street.

4   Mr. Barker was taking advantage of Mr. Litteral because

5   Mr. Barker couldn't purchase a firearm, but Mr. Litteral was

6   taking advantage of Mr. Barker by, you know, purchasing a

7   firearm for an addict and someone he wanted to keep in his

8   good graces.  Mr. Litteral wanted to keep in Mr. Barker's

9   good graces because Mr. Litteral wanted to continue to sell

10  drugs to Mr. Barker.  At least it appears that way from the

11  financial condition of Mr. Litteral at the time these events

12  were going on.  Right?  I mean, he had serious financial

13  problems, right?

14         MR. DAVIS:  Well, certainly.  He's certainly

15  indigent throughout this.

16         THE COURT:  Right.

17         MR. DAVIS:  I think there's no question about that.

18  I think there's no question about that.  And I think -- you

19  know, I think the Court does a very good job of cutting away

20  the chaff of this case, and I think that's -- that is what

21  this Court can do today that is most important, is to cut

22  away the chaff of this case and focus on what it really is

23  about.

24         And it is about Walter Litteral who was a decorated

25  war veteran who has been diagnosed with severe PTSD who

himself was addicted to the prescription painkillers that he
was feeling, and who had a very, very, very difficult
relationship with what was going on in the world.  And part
of that influenced by -- not entirely, but part of that
influenced by his mental condition.

When -- and just to tie this all back into the
departure motions, I'm going to start with the 5H1.11
military service departure.  That used to be something that
the guidelines forbid the Court from looking at.  In 2010,
following the Sentencing Reform Act, the committee went back
and looked at it again and reconsidered it.  And they decided
military service is something that is entirely different from
these other good works that should be excluded.

They did that in some degree of reliance, if not --
well, in fact, directly citing Supreme Court case *Porter v.*
*McCullom* where the Supreme Court recognized military service
is something that we consider to be a mitigating factor in
our nation when it is -- when it is present to an unusual
degree.

And I don't -- and so now that is an encouraged
departure under the guidelines.

THE COURT:  Well, I wouldn't say it's encouraged.
It's -- when it's present to an unusual degree and
distinguished the case from the typical cases.  So I
wouldn't -- I would say that is clearly giving more

discretion to judges before the amendment in 2010. But I
wouldn't say it encourages it. It says -- actually, when
you're dealing with these policy statements and Chapter 5(h)
of the guidelines, I have a hard time understanding to an
unusual degree and distinguishes case from a typical case.
There's really not much guidance to -- for courts in
understanding that phrase.

        MR. DAVIS: Well, I think you're -- you're -- Your
Honor is correct, that Your Honor has to find that it is, you
know, unusual -- the present of unusual degree and
distinguishes this case from other cases. And I agree with
the Court that there is not a whole lot of guidance out there
on that.

        I will note that, you know, the Fourth Circuit
defines an encouraged departure as being one that is phrased
in this way, if the Court finds that it is --

        THE COURT: Right.

        MR. DAVIS: -- finds those factors.

        THE COURT: I agree if you find those factors --

        MR. DAVIS: It is encouraged.

        THE COURT: -- then it is encouraged in that
context.

        MR. DAVIS: And --

        THE COURT: It's just finding them is hard to do
because we really have very little guidance on what that

1   phrase means.

2          MR. DAVIS:  I think that's true, Your Honor.  But I

3   think in this case by any standard, Mr. Litteral ought to

4   meet it.  There's no question that his military service is

5   unusual.  He is highly decorated.  He has his Bronze Star --

6   he has a Bronze Star with a Combat V for his courageous

7   actions in the first Gulf War that resulted in the capture of

8   the first POWs of that war where he with -- and I believe the

9   words of the accommodation are complete disregard for his own

10  personal safety, led machine gun -- two machine gun groups

11  back and forth across 300 meters of constantly -- constantly

12  attack open desert.

13         He has this long history.  He has this long combat

14  record, this record of extreme service in combat on the front

15  lines in Iraq, and that has shaped everything about who he

16  is.

17         I don't think that the Court can completely -- when

18  considering, you know, how does this apply here, I don't

19  think the Court can divorce it from the 5H1.3 departure on

20  mental health.  And I guess the good news is the guidelines

21  tell the Court you shouldn't divorce it.  You should consider

22  it sort of both of these in conjunction with other potential

23  factors.  And, you know, what -- I hope the Court had the

24  opportunity to read Dr. Cohen's report.

25         THE COURT:  I did.  And I read the whole report

1  because you actually said in your pleading that I need to
2  read the whole report.  I didn't just go to the end and read
3  the conclusion.  I read all 20 pages of it.

4         MR. DAVIS:  I greatly appreciate that, Your Honor.
5  I think some of the most moving parts of that report was
6  Mr. Litteral's reflections on his own memories.  And I think
7  reading those really show the lasting effect this trauma has
8  had on him, which is -- I think is why -- a large part of why
9  Dr. Cohen is able to reach the conclusion that PTSD -- severe
10 PTSD in conjunction with other factors significantly
11 contributed to the circumstances here.

12        THE COURT:  Well, but he -- you -- you said it
13 correctly by saying other factors, and he lists a lot of
14 other factors.

15        MR. DAVIS:  He does.

16        THE COURT:  And, you know, the severe financial
17 condition the defendant was in had -- had to have an impact
18 on his depression.  His severe back pains certainly had an
19 impact on how he acted.  And as you said, he needed drugs
20 himself for his back pain.  So -- so, yes, it makes sense
21 that PTSD is one of many contributing factors.  But your own
22 expert report says there was a lot of things that contributed
23 to his condition in 2015.

24        MR. DAVIS:  There were multiple things, yes.  And
25 I -- one thing that I think is an excellent jumpoff in terms

1    of his own addiction, where does that come from.  It comes

2    from the fact that Mr. Litteral ends up going to his own

3    doctor to -- you know, for all of his needs.  Why does that

4    happen?  It happens because he does not feel he's getting

5    sufficient treatment at the VA for his PTSD.

6         THE COURT:  Right.  The VA is -- the VA is

7    overworked.  It's not a secret that the VA has delayed

8    appointments.

9         MR. DAVIS:  Right.  And the unfortunate result, he

10   ended up getting much worse treatment by leaving the VA.  But

11   he made that decision because he didn't think he was getting

12   the treatment at the VA at a time when, you know, he was --

13   his mental condition was such that he was, frankly, maybe on

14   the verge of committing suicide.

15        THE COURT:  He actually attempted.

16        MR. DAVIS:  He did.  That's correct.

17        And the question for the Court is, is the PTSD

18   present to an unusual degree?  I don't think the ordinary

19   case involves much PTSD at all.  Certainly in this case it is

20   present in a significant contributing factor.  So, yes, it's

21   present to an unusual degree.  Does it distinguish this case

22   from the others?  I think it absolutely does.  Once again,

23   you have it as a significant contributing factor to this

24   situation.

25        So I think -- I think that it is clear that this

1   is -- that this PTSD contributes to an unusual degree in that

2   it distinguishes this case from others.

3           Now, at that point, it is still up to Your Honor to

4   make the decision about whether to apply the departure or

5   not.  But at that point, it is an encouraged departure, and

6   that's what we request the Court to do, is to enter that

7   encouraged departure.

8           And I think, you know, this gets us to the larger

9   argument, the argument that really matters, the 3553(a)

10  argument.

11          The nature, first to start off with, Mr. Litteral,

12  his history and characteristics.  The Court's had the

13  opportunity to read many letters on his behalf from people

14  who know him.  And at the risk of repeating myself, as I'm

15  prone to do, I think what you see in those letters is

16  something that emerges in his military service as well, this

17  idea of someone who goes out of his way to help people.  You

18  have a letter from his landscaper, from the lawn guy, who

19  says, you know, My son and I got violently robbed and

20  Mr. Litteral made us whole.  He didn't have anything to do

21  with that robbery.

22          You've got numerous occasions described in detail

23  by his daughter and others where he goes out of his way to

24  help people.  Even -- even in this case, as we cited in the

25  brief, even in this case, one of the factors in the Fifth

1   Circuit case actually got the transferee, the Barker
2   situation of a leadership role enhancement, is giving money
3   to the straw buyer.   In this case, the money that Mr. Barker
4   told him that you can keep, he gave it to somebody who had
5   his house burn down.

6           And that ties in with this idea of a man who will
7   run across that desert with the shells flying, with the
8   bullets flying.   This is not -- this isn't just disconnected.
9   These things all go together to form a picture of this
10  person.

11          And as I've listened to surveillance, one brief
12  segment stood out to me, and I'd like to -- it's very short,
13  so I'd like to play it for the Court.   You know, it may not
14  have the same impact for you as it did for me, but I think
15  it's worth hearing.
16          (Video played.)
17          MR. DAVIS:   And that's just a short clip.   But what
18  stood out to me, it's just completely off the cuff.   There's
19  no performance.   He doesn't know he's being surveilled in
20  here.   He is saying, you know, if I can make a deal with the
21  devil today, I'd be sick all the time so the people don't
22  have to be sick.   And that's consistent with everything about
23  him, everything about what his friends and family describe.
24  It's consistent with what it earned that Bronze Star with the
25  Combat V.

1          I think that's why his history and characteristics
2    show that an appropriate departure in this case, or a
3    variance if the Court were to find that technical
4    requirements of departure were not met, is warranted.  The
5    nature and circumstances of the offense, and we've gone over
6    a good bit of this, and I don't want to go -- I'll try not to
7    belabor it too much.

8          One thing I do want to point out in regards to
9    Mr. Campbell's role, because we have not discussed that very
10   often, is the evidence as I have reviewed it, and I've gone
11   through very thoroughly trying to find something that -- as
12   far as I can tell is not there.  But it certainly seems to me
13   that there's no real evidence that Mr. Litteral knew
14   Mr. Campbell was creating this grenade until after he had
15   done it.  It's very clear, very, very clear that on
16   July 29th, Mr. Campbell comes in to the confidential source's
17   store and says, you know, and it's like working on a grenade
18   in the store with a screwdriver and tells him, Yeah, I have,
19   I've already assembled one of them.  And this is news to the
20   source.

21         After Mr. Campbell leaves, he gets on the phone
22   to -- I'm not sure which agent.  He gets on the phone and
23   says, You're not going to believe this.  And then when
24   Mr. Litteral comes in, he doesn't know about it.

25         So they had -- they had certainly discussed

1  larger -- the larger ideas here.  They certainly discussed

2  their fears.  They had certainly discussed their preparations

3  up to and including explosives, but there is nothing in the

4  record that shows Mr. Litteral telling Mr. Campbell to create

5  a grenade.  They do talk about smoke grenades, but those are

6  very clear that they say smoke.  Until Mr. Campbell had

7  already done it.

8          So to the extent that that is a part of it, I -- I

9  think that, you know, it's a -- to say that Mr. Litteral was

10 instructing him how to make a grenade is not really accurate

11 here because it's already done to the point that it was when

12 the Government found it by the time Mr. Litteral was aware of

13 its existence.

14         THE COURT:  All right.  Summarize your arguments on

15 the departures and variance.

16         MR. DAVIS:  Yes, Your Honor.

17         So in summation -- well, let me just hit the

18 highlights very quickly.

19         THE COURT:  All right.

20         MR. DAVIS:  The question first -- the factors of

21 3553(a) to punishment, what is sufficient punishment in this

22 case.  Mr. Litteral has been locked up for almost a year now.

23 He has lost his spot as director.  He has lost a lot of the

24 glory that he carried before his offense.  That is certainly

25 something the Court should not ignore.

1          And one thing that I think the Court should
2    absolutely consider is that despite the fact that
3    Mr. Litteral was not in any way planning an attack unless
4    attacked first, his name comes up in media sources over and
5    over again and linked to domestic terrorism.  That's a stain
6    he will never wash off.  And this is not a domestic terrorism
7    case.
8          He made a lot of mistakes, and he admits those.
9    But his name is forever going to be associated with that, and
10   *The Washington Post* and *The New York Times*.  And that is --
11   that is a major -- a major drawback that he has received, a
12   major corollary punishment that when the Court considers both
13   -- both the punishment and the deterrence, I think the Court
14   has to consider those things.
15         THE COURT:  Yeah, but I'm not sure general
16   deterrence is in your client's favor, though.
17         MR. DAVIS:  Well, Your Honor --
18         THE COURT:  Because one -- in the argument over the
19   breadth of the Second Amendment, which is clearly a hot issue
20   in Washington right now, there's one thing that really both
21   sides agree that there's a certain group of American
22   citizens, of resident aliens that are prohibited from
23   possessing a firearm:  Convicted felons, drug addicts, aliens
24   who are not lawfully here, misdemeanants who commit domestic
25   crimes and domestic violence.  There's a group that's been

1    recognized are dispossessed to firearm.

2            And what he did was he helped one of those

3    dispossessed persons.  That is -- that is one thing where

4    there is pretty much uniform agreement that -- most people in

5    this country agree that there are certain people who should

6    never get firearms until they've gotten their civil rights

7    back, and he -- he violated that.  That's -- that's -- that

8    as important -- that's not domestic terrorism, but that is a

9    serious issue.

10           MR. DAVIS:  Yes, it is, Your Honor.  And he takes

11   full responsibility for that.

12           What I will point the Court to is the issue of

13   general deterrence.  First of all, we have to put all these

14   things in perspective.  You know, where does he fall on the

15   spectrum here.  In terms of a felony, you know, Christopher

16   Barker's was in 1993, and it was a suspended sentence.  He's

17   still a felon.  Still should -- absolutely should not

18   rebutted (phonetic) to a period until the end.

19           But on the scope of it, this is not, you know,

20   giving a gun to someone who got a bank robbery three years

21   ago or something to that.  I mean, on the relative spectrum

22   of providing a firearm to a felon, it is relatively low on

23   there.

24           The other thing I want to --

25           THE COURT:  But he also -- but Mr. Barker was an

1   active drug abuser, and drug abusers are prohibited persons,

2   I believe, under 922(g)(1).

3            MR. SAVAGE:  Yes.

4            MR. DAVIS:  That is absolutely correct, Your Honor.

5   I would -- I am curious about how much the general public is

6   aware of that particular fact.

7            THE COURT:  You're probably correct on that.  It's

8   not well known.

9            MR. DAVIS:  And the last thing I would say on

10  general deterrence is, you know, not very long ago there's

11  a -- a list of things about deterrence put out.  Five major

12  facts about deterrence.  And particularly, among them sending

13  an offender to prison isn't a very effective way to deter

14  crime, and increasing the severity of punishment does little

15  to deter crime.  This is -- these are in accord with a lot of

16  the research that's out there.  But the reason I bring this

17  particular publication up is because it was not done by a

18  particularly defendant-friendly group.  It's the Department

19  of Justice.

20           So the Department of Justice acknowledges that

21  extending sentences, putting people in prison is not a

22  particularly effective general deterrent.  In Mr. Litteral's

23  case, he's been in prison for a year.  He has lost an awful

24  lot, and it's happened publicly.  I think general deterrence

25  actually is not greater served by additional time in this

1   case.

2          And in terms of incapacitation and rehabilitation,

3   I think those can go hand in hand because I think what

4   Mr. Litteral needs is help.  And that's, you know, what

5   Dr. Cohen said, and Dr. Cohen set out a series of

6   communications that he believed will substantially reduce the

7   rehabilitation.

8          THE COURT:  I don't think anyone disagrees with you

9   on that last point.  I'm sure the Government agrees that the

10  defendant should receive mental health treatment.

11         MR. DAVIS:  And I'm -- I'm -- I hope so, and I'm

12  glad to hear that.

13         The question is:  Is an extended sentence going to

14  do anything good for him?  I think the answer is no.  What's

15  going to do good for him is putting him out in a monitored

16  program where he can get the help he needs and go back to

17  being the person he has been, go back to the person who won

18  that Bronze Star with Combat V, go back to being that type of

19  person who puts roofs on people's house for free because they

20  can't afford it, go back to being the father who got custody

21  of his kids in the divorce, which is, you know, monetarily

22  usual.  That's what we're asking the Court to do, to impose a

23  sentence that would be a two-level -- or a four-level

24  departure either structured as two under each of the

25  departure's prongs.  Alternatively, a variance under 3553(a)

1   to a year and a day.  That, I believe, is the appropriate

2   sentence in this case.

3            Your Honor, he has family members here on his

4   behalf, a number of them.  You know, I'd hope to get a chance

5   to speak to them before we began, but I have not.  But I

6   would still -- I still know a number of them would like to

7   address the Court, if the Court is amenable.  I know I've got

8   quite long, but if we could do that at this time.

9            THE COURT:  Yes.  But I'd like to limit it to two

10  people, if that's possible.

11           MR. DAVIS:  Two people.  Okay.  Can I have just a

12  moment, Your Honor?

13           THE COURT:  Yes.

14           (Pause in proceedings.)

15           MR. DAVIS:  Wayne Litteral, his son.

16           THE COURT:  I think make it three.  I think more

17  well-rounded presentation.

18           Please step forward and stand between the two

19  counsel's tables and state your full name.

20           MR. WAYNE LITTERAL:  Wayne Tyler Litteral, sir.

21           I just want to point out that my dad, he has --

22  he's the one that pushed me through everything, gone through

23  everything.  I went to the military and got out.  All I did

24  is want back home.  I already missed my first birth when I

25  was in El Paso, and now our other son is being born,

1    surprisingly either today or tomorrow.

2              THE COURT:  Congratulations.

3              MR. WAYNE LITTERAL:  Thank you, sir.

4              I just want him back home.  He already missed the

5    first year of my first son being born.  I don't want him to

6    miss the second.  Because, I mean -- when I moved back last

7    year, he helped me out a lot.  So, I mean, I'm going to raise

8    my son like how he raised me.

9              THE COURT:  Thank you, sir.  Thank you very much,

10   Mr. Litteral.

11             MR. KNIECLEY:  Good afternoon, sir.  My name is

12   Shaun Kniecley.  I'm the nephew of Mr. Litteral.  I've known

13   Mr. Litteral ever since I was three years old.  He's my

14   babysitter.  He used to walk me and my sister to school

15   safely every morning, get us ready.  On top of that he was

16   taking care of his mentally handicapped brother at the same

17   time.

18             In 30 years he's never changed.  He's always been

19   that way.  He is family bound and family strong.  And my

20   father passed away when I was 16.  And Mr. Litteral stepped

21   up as my father figure and gave me guidance in life.

22             I was proud to join the military, and he gave me

23   good guidance.  He goes, I knew you could do the Marine

24   Corps, but you're better than that.  That's why I decided not

25   to go to Marine Corps.  I went into the Navy.

THE COURT: And he said do better than that, in the Navy?

MR. KNIECLEY: Yes. Yes.

And after that, years, we've always been in touch. I seen him raise his family, get his children, great children. And I found on hard times. I went through a bitter divorce, lost my job, had nowhere to go, and without hesitation Mr. Litteral brought me into his house with his family, F.3d me, clothed me, gave me my CDL's back and got me a job with no questions asked. Thank you, sir.

Thank you very much, sir.

MRS. LITTERAL: I'm Kristal Litteral, his wife. We've been together 16 years. And there would be a whole lot of people, if they could. They live out of state or jobs or just can't make it physically.

We want him back home. I know that he knows what he's done has hurt all of us. He's made some poor choices, but I know he's learned from them and I know it's not somewhere he ever wants to be again. He's a great father and a great -- and I know we're not all perfect and we've all made mistakes, and he made mistakes, but I think that is what you learn from. I think he's learned he doesn't want to be away from his family ever again. And we just all need him back home. It's been very hard. We want to take care of him.

1          Thank you.

2          THE COURT:  Thank you, ma'am.

3          MR. DAVIS:  One last very corollary matter, but I

4    do think it's worthy of the Court's attention.  Obviously,

5    Mr. Litteral owned a large amount of legally possessed

6    firearms that were not --

7          THE COURT:  He sold them all.

8          MR. DAVIS:  He sold every single one.

9          THE COURT:  Except for, I guess, one.

10          MR. DAVIS:  Except for one family heirloom that

11   went for his grandson with the Government's kind permission

12   on that.  And we greatly appreciate the FBI's coordination

13   with us to get that done.

14          He made a point of getting rid of every single one

15   he had.  So there's no concern that he's going to go back in

16   possession of any of these.

17          THE COURT:  Mr. Litteral, you have the right to

18   address the Court if you so choose.

19          THE DEFENDANT:  Yes, sir.  May I?

20          Sir, I -- I feel as though in my heart I'm a great

21   embarrassment and even a bigger humiliation to my family.  I

22   know what I did was wrong.  I take full accountability and

23   total responsibility for the actions of which it would not be

24   coming of me any other day than it has.

25          I didn't know I had PTSD until my wife diagnosed

1  it.  And when she did and we started seeking treatment, it
2  was her that brought me forward to get treatment.  I owe a
3  lot to my wife and my children.  They've always been there
4  for me.  They will never turn their back on me.  They've all
5  said, Dad, we're all here with you.  Honey, we're all here
6  with you.  I don't know if I deserve it, but I certainly got
7  it and I'm proud and grateful for it.

8          Everything that's been discussed in here today that
9  I have done, it's inexcusable.  I fight with it every day
10 when I'm laying in my cell thinking, Why in the world -- how
11 did I get to this place.  How did I get in this position.
12 Bad judgment, poor decision-making and just complete overall
13 error lifestyle.

14         That, sir, being known and the lessons I learned, I
15 didn't just hurt myself, I killed my family.  And that --
16 that means more than me.  And I apologize to my family and
17 also apologize to the courts for my actions which has taken
18 up the time.

19         Thank you, Your Honor.
20         THE COURT:  Thank you, Mr. Litteral.
21         Mr. Savage.
22         MR. SAVAGE:  Thank you, Your Honor.
23         Your Honor, I'm not going to insult this Court by
24 saying that it should not consider the needs of a veteran,
25 particularly this veteran.  I think this Court knows more

about being a veteran than many people would. I think the
Government also is aware, perhaps was more experienced with
veterans than maybe even the defense counsel in this case.

THE COURT: Well, I mean, I -- we both know that
you served your country in the Air Force.

MR. SAVAGE: Yes, sir.

THE COURT: And I just recently retired, I believe.

MR. SAVAGE: Yes, sir. And, Your Honor, I
certainly respect the fact of people who do it, not
necessarily to retirement, and I certainly respect more
people who serve their country and put their life in danger,
and there's no dispute that Mr. Litteral did that.

But counter that with honor and duty and having
supervised Marines and knowing Marines, as this Court has,
it's just inconsistent with a Marine's creed. The fact that
this defendant has many people in his family -- his sons and
his nephew -- who respect him and love him who are also
military members, but then the plot to kill them in the event
that -- because of some fantasy that the Government is going
to come and take his guns because he doesn't agree
politically is simply inconsistent with the -- with the duty
and honor that a Marine should have.

And as a veteran, many people in this country
respect veterans, as they should. But how can veterans be
respected when they plot to overthrow the very government

1    that they -- that they promised and pledged to serve?  The

2    Constitution doesn't -- when you pledge to serve the

3    Constitution, honor and obey the orders of your superiors, as

4    this man did as a Marine, surely that would have carried on

5    to his life experiences.

6           So for those things, Your Honor, the Bronze star is

7    certainly something to be considered.  Making pipe bombs and

8    planning to blow up military members and threatening, as he

9    did, in a conversation with his wife and I quote, "If they

10   come to get my gun, it'll be a hell of a fight.  You know

11   that's what I'm worried about.  If it's local police, I'll

12   have a hard time shooting local police, I really would.  But

13   if it's the effing suits, people coming dressed in

14   paramilitary with blue hats and blue helmets, then I'm going

15   to have a -- I'm not going to have a hard time shooting

16   those."  I won't say the last word.

17          And Ms. Litteral says, "Let's not talk about that."

18          "Because I'm just saying if Crown Vics pull up and

19   that MFer or Suburbans or Tahoes and they're all blacked out,

20   somebody's dying.  I got to get the refrigerator cleaned out

21   so I can put all my automatics in there so I grab it and get

22   in the corner.  I'm just paranoid as hell."

23          Well, maybe that's an expression of PTSD or maybe

24   that's an expression of like, No, I'm going to be above the

25   law.

1          Now, PTSD, as the Court noted, manifests itself in
2    different ways, as does back pain.  Here's a picture of the
3    defendant and his wife as she appears -- speaking of -- there
4    you go.

5          So PTSD wasn't always present in this defendant's
6    life, loud noises, thrills, and that sort of thing.  Here's
7    the defendant with his wife at Carowinds.  His back problems
8    weren't always a problem.  He certainly could have good days.
9    Here's him working out.  I believe, in the defense statements
10   that defendant met his wife while working out.  So he
11   certainly is able to work out and do things.

12         Now, I'm not suggesting that there aren't bad days
13   this defendant has, but here's a bad day.  The defendant goes
14   into a store and sees that sign on the counter as he does it,
15   as he buys the gun for Mr. Barker.  And not just any gun --

16         THE COURT:  Is this -- was this taken at Gander
17   Mountain?

18         MR. SAVAGE:  Yes.  He buys this (indicating) gun,
19   an assault rifle.  Not a pistol, not a rifle, not a shotgun,
20   not -- not some mace, 100 different things Mr. Barker could
21   have had if Mr. Litteral really wanted to counsel him as his
22   family says he has other people.  He buys this (indicating)
23   gun with a 30-round shot.

24         And you mentioned the various problems that
25   Mr. Litteral had with finances.  But where did he spend his

money?  He spent his money purchasing pipe bombs, various
things.  Here are just a few of the guns that were found --
and they're legal.  I'm not saying they weren't -- found in
his house.  Here's his gun cabinet.  I'm going to put this
the right way.

It's a virtual arsenal.  And if he was truly there
or a peaceable person, what person drives around in their car
with two pistols strapped in a place where you can grab them
at any moment.

And if you recognized that he had PTSD all those
times, you got to ask yourself why, why this family allowed
somebody like this who has these problems, who attempted
suicide, to possess a virtual arsenal of weapons.

Now, one of the things that we have a problem with
in this country is people with psychological problems having
access to legal weapons.  This person went beyond that,
knowingly about those weapons.  But more than that, this is a
guy who is getting 100 Hydrocodone and 50 Oxycodone a month.
And he's selling them.

And, Your Honor, this is where I think the
Government's recognition of the defendant's service comes in.
What the defense counsel does not mention in this whole case
is this is a charge market.  We selected the charges that
would be applied here.  We deliberately did not select, and
the Court should know this, the drug charges in this

1    indictment.  And the reason we didn't select them is because
2    in the 2015 amendments to the guidelines, the way that
3    Hydrocodone is treated, it became a Schedule II drug.  If the
4    Government had charged the Hydrocodone in this case and we
5    had proved, as I think we could, that he distributed 100
6    Hydro and 50 Oxy per month to the defendant, to the defendant
7    Mr. Barker, over 24 months, the offense level would have been
8    28.

9            Now, the defendant before he walked into this
10   courtroom, recognizing his military service, wanting to do
11   the fair thing in here is facing a level 17.  He's already
12   been the beneficiary of a 10-level departure before he came
13   in.  This was a charge market.

14           And what he doesn't say when he was helping people,
15   he knew that Mr. Barker was an addict, but he didn't stop
16   giving it to him.  He didn't help him seek treatment.  He
17   didn't point him in the right way.  He kept feeding him these
18   pills.  In addition, when he needed more money, he tried to
19   sell his pills to Mr. Campbell.  But Mr. Barker was always a
20   willing person to buy them because he knew he was addicted.
21   Mr. Barker admitted it and Mr. Litteral admitted it in his
22   statement.

23           So if there's anything that Mr. Litteral should be
24   ashamed of, he should be ashamed of feeding the addiction of
25   Mr. Barker and then selling him or trying to get for him this

1  gun.

2        If he knew he had a problem, as he did, what --

3  what incentive is there for this person to seek treatment

4  from the VA or anywhere else.  He didn't stop going to the VA

5  just because the psychiatrist wouldn't see him.  He stopped

6  going to the VA because the VA has a good system of

7  monitoring how many Hydrocodone and how many Oxycodone

8  they're getting.  He went because he has drug-seeking

9  behavior to other freaking -- or other -- sorry -- other

10  doctors who would give him drugs so he could sell them.  And

11  if he had the problems he had, he wasn't using the drugs; he

12  was selling the drugs regularly for 24 months.

13        Here, the Court's right.  He's a drug pusher.  And

14  where in the analysis of this, of PTSD, does it say, I became

15  depressed and paranoid.  I lost control of myself.  I didn't

16  understand my government.  I became paranoid so I decided to

17  become a drug pusher.  Literally, a drug pusher.

18        And that has consequences.  And you're right, the

19  Government has taken a different view than the Justice

20  Department of deterrence.

21        We're not asking an for offense level 28 here.

22  That would have been a seven- to eight-year sentence.  We're

23  saying a fair sentence is somewhere in the middle of this

24  guideline.  Perhaps he deserves more; perhaps not.  But for

25  the fact of the matter is because guns are an important

thing, because putting addicts and mentally unstable people in possession of guns is illegal and notably dangerous, that deserves specific deterrence. It should never happen again.

More than that, it should be general deterrence so people around this country know, as we keep saying and hearing after one tragedy after another, that the gun laws in this country have force and they have effect. So they have to have some sort of meaningful punishment.

Do not give him seven or eight years for the drugs, but do give him 27 months, somewhere in the middle of the guideline, for the conduct that he has pled guilty to. Although it's only a part of it. Only part and parcel.

If we had parsed this whole thing out, perhaps Mr. Davis would have a point. Perhaps we would be talking about a Zone C. But we're not talking about just a sliver of the behavior. We're looking at the whole picture, as the Government did when it made this plea bargain.

So but for the fact -- but for the fact that the Government allowed this defendant to plead guilty to three counts, not including the drugs, we would be looking at a much different situation.

The defense wants you to cut it in half based on that -- on top of that. We suggest that's unreasonable. It's unfair. And with regards to creating disparate sentences, it's certainly unfair to Mr. Barker and

1    Mr. Campbell who cooperated and got 21 months each and
2    provided evidence and were prepared to cooperate, pled guilty
3    before they had to go to an indictment, versus Mr. Litteral
4    who forced the Government into an indictment and did not
5    cooperate with the same degree and same matter as Mr. Barker
6    and Mr. Campbell.
7         So for those reasons, taking all of the 3553(a)
8    factors together, including the seriousness of the offense,
9    especially considering the character, the good character and
10   mental incapacity of this defendant, considering all the
11   different things, including specific and general deterrence,
12   the Government believes that a sentence of 27 months is not
13   greater than necessary to -- is sufficient, but not greater
14   than necessary to address the conduct in this case.
15        We certainly think that we could have gone much
16   higher, but we think that we were fair to this defendant and
17   we think that -- we ask the Court to be fair as well, not
18   just to the Government but to Mr. Barker and to other people
19   like him with this -- with regards to the type of conduct
20   that occurred to this case.
21        THE COURT:  Thank you, Mr. Savage.
22        MR. DAVIS:  Your Honor, I think there is a couple
23   of points there that need -- that desperately need rebuttal.
24   The first of which is I'm confident the Government is aware
25   that if they had applied the 2015 guideline which came into

1    effect on November 1st, 2015, to Mr. Litteral's conduct, that

2    would be ex post facto violation.  So that was at non-issue.

3              What I mentioned earlier is that, you know, if we

4    had to hash out the number of pills in this Court, I think we

5    would have a lot to talk about.  And I think that's

6    absolutely correct, because the only actual real evidence

7    that I have located in all of the discovery are Mr. Barker's

8    comments that Mr. Litteral sold him a couple hundred

9    Hydrocodone in the last few months and less Oxy, and

10   Mr. Litteral essentially confirmed that same thing, that

11   there was 100 in the last week.  Now, there is evidence of

12   individual sales to Mr. Barker, but certainly none that would

13   increase the amount over that 100 -- couple hundred in the

14   last few months that he said.

15             THE COURT:  Well --

16             MR. DAVIS:  The sales that are evident are in

17   there.

18             THE COURT:  Maybe Mr. Savage can help me though.

19   There's somewhere -- I thought there was like $5,000 in drug

20   sales.  Am I -- did I just make that up?  I mean, this is a

21   well pled case.  There's hundreds of pages of pleadings.

22             MR. SAVAGE:  Mr. Barker estimated that he was

23   paying Mr. Litteral $2,000 a month.

24             THE COURT:  And for how many months?

25             MR. SAVAGE:  Twenty-four.

1          MR. DAVIS:  There is absolutely nothing in the
2     evidence, nothing that says 24 months.  Mr. Barker did not
3     say that in his interview.  He didn't say it.  It didn't
4     happen.  You know, he -- the closest thing to that is in the
5     factual basis there's 100 pills per month, but there is still
6     no time frame.
7          THE COURT:  All right.  Well, I --
8          MR. DAVIS:  Regardless of that, Your Honor, we
9     would still be looking at this level 28 that Mr. Savage --
10          THE COURT:  Well, I --
11          MR. DAVIS:  -- because there would be an
12     ex post facto violation.
13          THE COURT:  What you're saying about ex post facto
14     is probably correct.  But what Mr. Savage is -- and that's as
15     to the offense level.  But Mr. Savage is correct that there
16     was no charge for drug trafficking.
17          MR. DAVIS:  That is correct.
18          THE COURT:  And that probably would have been a
19     much more severe sentencing guideline range.
20          MR. DAVIS:  I disagree, Your Honor.
21          THE COURT:  All right.
22          MR. DAVIS:  I think based on the actual evidence
23     that is in there, what you actually see in the testimony of
24     specific pill sales, that would end up being about an offense
25     level of 16.  Now, it would probably go greater than that.

1          But still, if you doubled it, we would be at an
2     offense level of 18.  And even if higher than that, you'd be
3     in an offense level of 20.  The Government would have to put
4     on some evidence if they wanted to get higher than that, and
5     there hasn't been any.  I don't think they can rely on the
6     idea of, Well, probably we would have come up with some
7     evidence if we had to prove that in a different way.
8          Now, they absolutely did agree to drop that charge,
9     and I don't dispute that.
10          THE COURT:  All right.
11          MR. DAVIS:  But we would have heavily disputed the
12     amounts.  And even if we hadn't, it would have been a
13     substantially lower guideline.  Probably we would contend
14     that what the evidence actually shows would be a guideline
15     that was no greater than what he has right now.  So I don't
16     think that the idea that this was the significant benefit
17     that cuts against all of Mr. Litteral's good deeds.  I think
18     that is misleading at best.
19          Now, a couple other things --
20          THE COURT:  I mean, the Government did charge --
21     there were two counts that were -- are to be dismissed in a
22     few moments -- three counts to be dismissed.  And two of
23     those are drug trafficking counts.
24          MR. DAVIS:  Yes.  That's correct, Your Honor.
25     Though we don't think the facts would have sustained the

1    conspiracy count.  But be that as it may --

2           THE COURT:  Oh.

3           MR. DAVIS:  -- the guidelines would be the same for

4    the -- for an actual distribution.

5           THE COURT:  Right.  It wouldn't make any difference

6    there.  But you're -- you're -- you're correct.  The

7    Government would have to find another co-conspirator, but it

8    doesn't have to be.  It can be unidentified, though.

9           MR. DAVIS:  True, but I don't think they'd have it,

10   even that.

11          Be that as it may, we'd also dispute that they

12   would have prevailed on the account for Mr. Campbell.  What

13   we do not dispute is that they absolutely dismissed that, the

14   actual distribution count.  That is absolutely their -- you

15   know, they did that, and that was their choice, and

16   Mr. Litteral is very appreciative of the Government in that

17   regard.  But it would not have ended up with him having a

18   guidelines substantially higher than where he is.  I don't

19   think that is accurate.

20          The other thing that I do not think is -- well,

21   maybe "fair" is the word in regards to the segments that

22   Mr. Savage read from the phone calls from Mr. Litteral, when

23   Mr. Savage refers to the defense having noted a

24   misrepresentation.  I think it's fair to say there's at least

25   some omission here.  What he did not read in that exact same

```
 1   phone call where he read -- he didn't read --
 2             THE COURT:  Well, that -- I -- I understand that.
 3   You put that in writing in your --
 4             MR. DAVIS:  Good.
 5             THE COURT:  -- filing on April 6.
 6             MR. DAVIS:  Yes, Your Honor.  And I'm glad the
 7   Court --
 8             THE COURT:  What you refer to as, quote, the wife
 9   call.
10             MR. DAVIS:  I appreciate that, Your Honor.  And so
11   I will not go over that again.  But I think that when you
12   actually look at it, it is substantially a different story
13   than it is portrayed.
14             The last thing --
15             THE COURT:  But he did say -- he did say what
16   Mr. Savage said.
17             MR. SAVAGE:  No, he did not.  The one thing he did
18   not say is "if they come and get my guns."  That was what
19   Mr. Savage started his quote with.  Ms. Litteral said, Are
20   they going to come and get guns?  And he started by saying,
21   no.  No.
22             THE COURT:  Right.  But then he went on to say,
23   Well, they better not because it would be a hell of a fight.
24             MR. DAVIS:  Right.  And that is substantially
25   different.  It's this active plan to go attack that is being
```

portrayed.  What the act of plan was was to go to lawfully
elected officials and propeal through lawful means.  That is
clear in the preceding four minutes of that call, which it
did not print out verbatim because it would be quite lengthy.

But the preceding four minutes of that call, the
surveillance of him talking to Mr. Campbell and the human
source around that same time, his calls to the NRA to seek
assistance, Mr. Litteral was looking for redress through
lawful means.

Now, of course, he had, in fact, committed a crime
at this time.  But the point is simply this idea that he was
ready to take up arms and start shooting people the next day
is a dramatic overexaggeration based on his reaction to a
hypothetical that he himself did not pose.

The final -- but I do think there's another point
to be made out of the call, which is the end of it which
Mr. Savage stopped, I think, before saying the end of it,
which he ended that statement by saying, I'm just getting
paranoid as hell.  And that goes back to, you know, where
does the PTSD come in.  I'm just getting paranoid as hell.
That's PTSD.  That is as classical as it gets.  So I think it
does figure into this equation.

All of these things come together, and I think in a
reasonable consideration of who Mr. Litteral is, his service
to this nation and the combination of circumstances that

1   brought him here, 12 months and a day is a reasonable and

2   correct sentence that is sufficient, but not greater than

3   necessary, to meet the objectives in 3553(a).

4           THE COURT:  Thank you.

5           Ten seconds, Mr. Savage.  Nothing.

6           MR. SAVAGE:  Your Honor, I don't want to quibble.

7   We have -- we have -- Mr. Barker was interviewed more than

8   once.  I would point out that on the 14th of September where

9   we debriefed him again, he said, quote, he paid probably $6

10  for Hydro, 24 for Oxy, estimating he would have received

11  approximately 100 Hydro and 50 to 60 Oxy per month.  He's not

12  aware of who was prescribing the pills.

13          Barker would almost always go to Litteral's house

14  to pick up his pills but only saw his wife.  Before he said

15  approximately two to two and a half years ago Barker

16  became -- began purchasing Hydrocodone and Oxy from Litteral.

17  Barker was uncertain if they were -- Barker was uncertain if

18  they were Oxycodone or OxyContin but described them as a

19  greenish color and having the letter OP and EDM on them.  He

20  believed that Litteral sold them to him because he was a sure

21  thing and didn't have to worry about Barker telling anyone

22  because he was a loaner.

23          I would note that in the -- in Count Six of the

24  indictment that we begin the date on October 6, 2014, which

25  is the day of the congressional act that moved OxyContin from

1  a Schedule III to a Schedule II.

2       I don't want to parse back and forth whether
3  Mr. Davis can prove or disapprove or whether we would have
4  been able to prove 100 pills.  I think the Court gets the
5  gist of it.

6       There is a significant departure based on this
7  charge bargain, and I think that it's obvious that the fact
8  that OxyContin, whether it started in 2000 -- November of
9  2015 or otherwise, based on this particular fact there was a
10 substantial discount also already because of the charge
11 bargain the Government made.

12      At the time Mr. Davis was grateful for it.
13 Apparently, at this particular time he wants his cake and eat
14 it too.  I think that the facts speak for themselves.  If the
15 Court has any questions whatsoever.  It is never the purpose
16 of the Government to misrepresent anything to this Court, and
17 we would not do so.

18      I do specifically say -- remember mentioning the
19 paranoia in connection with the PTSD, and we never said that
20 Mr. Barker didn't say that he would try and get through this
21 with lawful means, but as soon as he got done with that, he
22 went on a rant about how he was going to kill anybody who
23 came to take his guns.  I think that's a fair assessment of
24 the evidence.  Everybody is entitled to their opinion.

25      THE COURT:  All right.  Thank you.

1          MR. DAVIS:  Your Honor, I do need to note one thing

2    for the record, which is that that report was never produced

3    in discovery.  And it does trouble me that there may be *Brady*

4    material involved, because I have never seen this, a period

5    before Mr. Barker.

6          MR. SAVAGE:  Here you go.  I'll look at it.

7          But he also said that he never received the

8    evidence that was the basis of Gander Mountain, and the

9    evidence that I filed with respect to 302 on Gander Mountain

10   has a -- has a Bates stamp on it.  So, I mean, you might

11   check your record before you find out.

12         MR. DAVIS:  This does not have a Bates stamp on it.

13         MR. SAVAGE:  No, this is one I got from my -- from

14   the FBI.

15         MR. DAVIS:  We produced -- we printed this --

16         MR. SAVAGE:  If there's something missing --

17         THE COURT:  Well, one speak at a time.

18         MR. SAVAGE:  If there's something missing, he has

19   it now.  Let him read it.  I will certainly apologize if

20   that's the case.  But it's a two-page -- it's a two-page

21   brief.  I'll go back and I will have my database with me.

22   I'll go look for it.  If it's not there, I'll have an

23   apology.

24         MR. DAVIS:  And I did -- I did review all of the

25   discovery to the best of my ability over the past few days to

1  see if this -- from Mr. Moss had been produced.  I did not

2  find it.  Previously -- you know, it was produced last week.

3  Don't get me wrong.  It has been produced prior to this

4  hearing, obviously.  "This" being Mr. Moss's interview.

5          THE COURT:  So you did get it last week?

6          MR. DAVIS:  I did get Mr. Moss's.

7          THE COURT:  Right.

8          MR. DAVIS:  Agent Moss's.  Sorry.

9          Mr. Barker's second debrief, we were not even aware

10  there was a second debrief until Mr. Savage just said it.  It

11  makes me -- I don't have any of these 302s.  I may not have

12  any at all.

13          THE COURT:  Well, if there's anything exculpatory

14  in there, then that's an issue.  But I don't believe there's

15  -- from what Mr. Savage read, it's not exculpatory; it's

16  inculpatory.  And it's the -- Rule 16 doesn't specifically

17  require the disclosure.  But I know generally the U.S.

18  Attorney's Office does turn over everything, but they have

19  exceptions to protect the confidential sources and some other

20  things related to that.

21          Well, the Court will proceed.  That's an issue

22  which is not --

23          MR. DAVIS:  Well, Your Honor, I would just note for

24  the record, that in here it states that Mr. Barker filed all

25  serial numbers and drilled holes in the top of end caps

previously that have been presented as though that may have

been Mr. Litteral that did this.  This was, of course,

pre-plea.  I would argue that right there is to some degree

exculpatory.

I don't know if this is relevant.  I'm not making a

*Brady* motion at this point.  I'm not making -- I'm not

claiming a *Brady* violation at this point.  At this stage I am

not sure that this has an ultimate impact.  What I do want to

convey to the Court is we have not had the opportunity to

look and address this evidence, and the Court shouldn't

either.

MR. SAVAGE:  Your Honor, it's nothing more than

what's in the first -- it's basically what was in the first

interview.  I mean, if the Court wishes to disregard it, I

don't have any objection to that.  I mean, I believe we gave

him everything.  I'd have to go back and check with

production.

THE COURT:  Do we maybe come back at 4:00 o'clock

and shake out any little things like this?  Because I'm a

little concerned that -- you know, I can't disregard that,

but I also heard that.  What if we come back at 4:00 o'clock?

MR. SAVAGE:  Your Honor --

THE COURT:  Oh, come back at 3:00 o'clock.

Because we've done everything except for shaking

out these -- these issues of some interviews.  I mean, I

1    really do think you need to have an opportunity to read any
2    -- a report like this.  Although I'm not saying the
3    Government had an obligation to turn it over to you, but I
4    think now that we've drifted into it.
5            MR. SAVAGE:  Your Honor, we'll withdraw that other
6    one --
7            But here's the -- here's what it said in the first
8    interview.  This is the one on 8/24 -- 8/1.  This is a
9    summary.  I think the defendant -- defense counsel agrees --
10   provided it for purposes of this point.  Litteral provided
11   Barker with Hydro, a/k/a yellow, for 4- to $5 each and Oxy
12   for $25 each.  He has been purchasing pills from Litteral for
13   one to two years.
14           I think it proves the point.  It's basically the
15   same thing that was said in the --
16           He also said Barker advised him to buy pipes and
17   end caps to Litteral.  He had purchased them in a hardware
18   store on two separate occasions, but then Litteral believed
19   they were from a workplace.  Barker purposely provided the
20   wrong sized caps to Barker [sic] because he knew he was
21   making explosives and didn't want to be part of it.
22           The only thing that's not in here is that he
23   drilled holes in them, but clearly the Government's position
24   has always been did not charge this is because the conspiracy
25   because Barker did not agree with Litteral to make --

1  Litteral believed he did, but he did not.

2          So for all those reasons the second interview,

3  which we believe was turned over, but even if it wasn't, is

4  nothing more than an amplification of the first.

5          THE COURT:  All right.

6          MR. DAVIS:  I -- I actually do disagree that he

7  states a time frame in that interview to the point -- to the

8  extent that that's relevant to the Court.  But I think having

9  watched that interview numerous times, I don't think he

10  actually does says a time frame.

11          However, be that as it may, I also, you know, think

12  that at this point to the extent the Government has withdrawn

13  its evidence of that second interview and to the extent the

14  Government represents here, which I'm sure that Mr. Savage

15  will, that it has produced all -- you know, all of these,

16  unless there's something else, I think that, you know, if the

17  Court is -- is, you know, pretty much prepared to rule on

18  this.

19          THE COURT:  Right.

20          MR. DAVIS:  The ultimate point that I feel is it's

21  an ex post facto violation if you try to use the 2015

22  guidelines and it applies to the guidelines, whether or not

23  the statute has changed.

24          THE COURT:  All right.  Why don't we just leave it,

25  and I will consider no more than the fact that there clearly

was a charge bargain here.  We don't know what -- how severe
the drug charges would have been.  But clearly, the defendant
has not been charged with drug trafficking, even though
there's no denial that he was involved in drug trafficking by
the defense.

      MR. DAVIS:  Right.  I mean, I guess technically he
was charged, but it's been dismissed.

      THE COURT:  He was charged, but we're dismissing
Counts Five and Six in the next five minutes probably.

      MR. DAVIS:  Correct.

      THE COURT:  All right.  So if we leave it at that,
then I think we're -- we don't have an issue with regard to
discovery.  I just won't be considering the quantity of
drugs.  And, therefore, since I'm not considering the
quantity of drugs, I am not looking at the severity of the
drug offense, but I am aware that the defendant has admitted
to drug trafficking, even though he has not been -- he is not
admitting to the Counts Five or Six.

      All right.  The Court wants to note there are no
identifiable victims in this case.  The Justice for All Act
and Mandatory Victim Restitution Act do not apply.  The
counts of conviction all deal with society, the United States
of America being the victim.

      I believe there's a -- there is some criminal
forfeiture I guess of --

1        MR. SAVAGE:  Yes, Your Honor.

2        THE COURT:  -- some -- some items, but I'll

3   incorporate the consent judgment in the final judgment.

4        Has there -- has there been a consent judgment?  I

5   don't know if there has been.

6        MR. SAVAGE:  Your Honor, unfortunately,

7   Mr. Bradford usually is here with his papers.  He's retired.

8   If there's not --

9        THE COURT:  No, I -- there it is, Document No. 37.

10  Okay.  I found it.

11       MR. SAVAGE:  It is the -- it is the pipe rifle

12  powder, the pipe nipples, end caps, ammunition, various

13  things.

14       THE COURT:  Thank you.

15       Mr. Litteral, would you please stand.

16       THE DEFENDANT:  Yes, sir.

17       THE COURT:  Mr. Litteral, there's a three-step

18  process this Court must go through in determinating the

19  appropriate and reasonable sentence in this case.  This

20  three-step process is set forth in a series of Supreme Court

21  decisions, starting with *United States v. Booker*.

22       The first step in the process, the Court's required

23  to calculate the advisory guideline range.  As you're aware

24  at the beginning of this hearing, we determined your range is

25  24 to 30 months.  That's just advisory.  The Court is not

1    bound by that, but the Court must calculate it as a starting
2    point for the appropriate sentence in your case.
3              The second step in the process, the Court is to
4    look to the sentencing guidelines manual to see if there's
5    any departure bases that would allow this Court to depart
6    from the 24- to 30-month range.  And your counsel has very
7    diligently argued there are two bases for departure, Sections
8    5H1.3 as to mental and emotional conditions, and
9    Section 5H1.1, military service.
10             These -- these particular departures that are found
11   in Chapter 5(h) of the guidelines manual are -- are hard to
12   apply sometimes because of the phrase that I brought up
13   earlier in this hearing, that they are to be considered when
14   the mental and emotional condition or the military service is
15   to an unusual degree and distinguishing the case from the
16   typical cases covered by the guidelines.
17             That -- that is -- that is hard -- we don't have a
18   lot of case law or commentary of the guidelines to help us
19   know exactly what to an unusual degree is, but I will say
20   this:  These -- both of these departure factors can be
21   considered individually or in combination.  And I think in
22   combination is appropriate in your case because the PTSD does
23   appear to be, at least from the record before this Court,
24   directly related to your military service.
25             Now, there are many other factors that affected

your mental health, but I do think a modest departure, and I do emphasize this, modest departure, not a large departure, is appropriate in your case because you are a great hero, and I thank you for your military service. A Bronze Star is given out pretty freely, but a V for bravery is rarely given out. I understand that. So you really and truly are an American hero, but just because you're an American hero doesn't mean you're exempted from the laws of this land.

More on that in a moment.

But in combining those two, I do think looking at them in combination, there is a basis for departure, but I'm going to explain why it's a modest departure in a moment.

So I am granting the departure for your mental condition of PTSD and for your distinguished military service.

The third -- and I'll give measurement of that in a moment.

The third and usually the most important step in the sentencing process, but in your case the departure step was pretty important, the Court must consider a series of sentencing factors at Title, 18 U.S. Code, Section 3553(a). Those sentencing factors were enacted by Congress to guide courts in fashioning sentences that are sufficient, but not greater than necessary, to accomplish the goals of sentencing. I have considered all of the sentencing factors.

I want to highlight some that are particularly important in your case.

First is your history and characteristics.  Like I said a moment ago, thank you for your military service.  You literally put your life on the line to protect our freedom and liberty.  But, you know, one thing you also did as part of your military service, and Mr. Savage alluded to it, is that the day you enlisted, you raised your right hand and you swore to uphold the Constitution of the United States.  That's what Marines do.  Marines protect the rule of law.  In our case, the rule of law is the Constitution and the statutes that have been enacted pursuant to that constitutional authority empowered in the legislative and executive branches.

So when a Marine -- and I call you a Marine because there's no such thing as a former Marine.  "Once a Marine, always a Marine."

THE DEFENDANT:  Yes, sir.

THE COURT:  As a Marine, you know that you have a duty to uphold the rule of law.  And you defied that duty, and I know that must trouble you.

The part of the problem I've had today and through your case has been this tension between paranoia and terrorism.  And, you know, the Government properly investigated this case with vigor because of some evidence

1    suggesting that you were attempting to do something that is

2    inconsistent with upholding the rule of law; that was,

3    interfere in ongoing military operations and possibly commit

4    violent acts.

5         Now, the Government hasn't proven that today.  They

6    argued that as motive, and that's totally appropriate.  But

7    you're guilty beyond a reasonable doubt to the three counts

8    to which you've pled guilty.  And -- and those do show, those

9    counts show that you had a certain degree of paranoia in the

10   way you acted.  It was certainly related to your PTSD.  It's

11   probably related to your own drug problems.

12        No one is saying today you are a domestic

13   terrorist; although, I think everyone is saying that you said

14   some things that were very severe and suggests paranoia.  But

15   I -- but I don't want anyone to misunderstand the

16   Government's vigor in this case was absolutely appropriate.

17   The Government, when it gets a hint of a domestic terrorist

18   act, has to focus on that 100 percent until it rules out the

19   possibility of domestic terrorism.

20        So that's -- your history and characteristics are

21   very much advisory -- aggravate against you in the sense that

22   you are a Marine and you had a duty to uphold the rule of

23   law.  And they mitigate in your favor because you were a

24   Marine and you've done so much for this country.  It's a

25   conflict that it's tough for this Court to resolve.

1    The Court's also concerned about the nature and

2   circumstances of the offense, and I said that through the

3   course of this hearing.  There's no doubt you were selling

4   drugs to someone that was addicted.  And there's no doubt you

5   went and purchased a firearm for someone who was a drug

6   addict and felon.  And that is something that is really not

7   in debate in this country right now.

8    While we're debating the breadth of the Second

9   Amendment, no one is debating the issue about people that

10  have been adjudicated to have lost their rights to possess

11  firearms should get around that by having straw purchasers.

12  I mean, that is the big debate, that we aren't doing enough

13  to limit the possession of firearms by certain people who

14  have mental illnesses or are drug addicts or convicted felons

15  or committed misdemeanor crimes or domestic violence.  I

16  mean, we are -- that's the one area where there seems to be a

17  little debate.  And that's what you did.  You allowed a wrong

18  person to get -- you were intending to have the wrong person

19  get possession of a firearm.

20    I'm also very concerned about general deterrence,

21  and I understand that the Justice Department has been doing

22  some studies that say maybe we don't have that much general

23  deterrence from sentencings, but Congress has recognized that

24  the purpose of sentencing is general deterrence, deterring

25  others from this criminal conduct.  So I think to sentence

1   you in a way, at least as Congress has said in considering

2   the sentencing factors, in a way to discourage others like

3   yourself from making straw purchases to convicted felons.

4   And I am -- I am concerned about general deterrence.

5           Specific deterrence, deterring you in the future

6   from doing this, I am not at all worried about that.  I am

7   certain, I am certain you will never commit another felony.

8   When I saw you in tears because you knew you had victimized

9   your family, that was so sincere.  I know the record is

10  clear.  You really do care and love your family and your

11  friends, and that -- that is -- their victimization is a

12  collateral consequence of your criminal act.

13          You did receive the benefit as part of your plea

14  agreement of having -- or soon to have the drug charges

15  dismissed.  That is something that you have to realize is

16  definitely in your favor, and it's something that the

17  Government rightly points out even though there's a dispute

18  between the parties as to what was -- what would you have

19  been exposed to for sentencing.  But nonetheless, it's

20  definitely favorable to you that those charges are being

21  dropped.

22          So ultimately it comes down to, after considering

23  all of the sentencing factors, what is the just punishment in

24  this case.  Your counsel is asking for a punishment all the

25  way down to basically almost effectively time served, if you

consider time off for good behavior.  The Government's asking
roughly at this point for 27 months before this Court's
earlier ruling.  Probably is asking for a larger -- would
have been asking for a few more months than that.

I -- I do not believe that time served --
effectively time served or a variance of one year and one
day, which ends up being roughly a sentence of 10 months,
because one year and a one day qualifies you for time off for
good behavior.

For this crime of being a straw purchaser for a
convicted felon and a drug addict, I -- I don't think that is
a sufficient punishment because we don't want convicted
felons possessing assault weapons.  I don't think there's
much debate in this country about that.

I said earlier that you are -- that is a --
departure is appropriate in this case because of your
military service and your related PTSD, but I did not answer
the question what's the extent of the departure.  I have to
factor in whether others similarly situated to you were
sentenced in a way that reflects their role in the offense as
compared to you.  When I learned that your fellow
conspirators received sentences at 21 months and they
cooperated much more quickly than you and they provided --
they didn't require an indictment.  I guess they were -- pled
to a Bill of Information.

1      Is that it, Mr. Savage?  They pled to Bills of
2  Information?
3      MR. SAVAGE:  Yes, Your Honor.
4      THE COURT:  All right.
5      I think it would be unjust for you to receive a
6  sentence less than their sentences at 21 months.  So my
7  window is -- is for a departure from 24 months is down to no
8  more than 21 months.  So you fall in a very narrow range.
9  And I think, though, you do need to be punished a little bit
10 more than those who cooperated much more quickly and saved
11 the Government money in a very critical investigation, had to
12 move quickly because the stakes could have been terribly high
13 if you were involved in an act of domestic terrorism.
14      So ultimately it brings me, even with a departure,
15 which is appropriate, down to a sentence of 22 months.  So
16 you will not be released from custody until you serve
17 approximately another year or thereabouts, a little less than
18 that probably, in the custody of the Bureau of Prisons.
19      With that said, the Court will now state a sentence
20 that's sufficient, but not greater than necessary, to
21 accomplish the goals of sentencing.  Would invite the
22 attorneys to listen to the proposed sentence so if there's a
23 legal reason why it should not be imposed, you can so advise.
24      The Court proposes the following sentence:
25      Pursuant to the Sentencing Reform Act of 1984 and

1    *United States v. Booker*, it's the judgment of the Court,

2    having considered the factors noted in 18 U.S.C. Section

3    3553(a), that the defendant Walter Eugene Litteral is hereby

4    committed to the custody of the United States Bureau of

5    Prisons to be in prison for a term of 22 months on each of

6    Counts One, Two and Three.  All such terms to be served

7    concurrently.

8            The Court calls the attention of custodial

9    authorities that the defendant has a history of mental health

10   issues and recommends the defendant be allowed to participate

11   in any available mental health treatment programs while

12   incarcerated.

13           Upon release from imprisonment, defendant shall be

14   placed on supervised release for a term of three years.  This

15   term consists of terms of three years on each of Counts One,

16   Two and Three.  All such terms to run concurrently.

17           Within 72 hours of release from the custody of the

18   Bureau of Prisons, the defendant shall report in person to

19   the probation office in the district to which the defendant

20   is released.

21           While on supervised release, the defendant shall

22   not commit another federal, state or local crime, and shall

23   comply with the standard conditions that have been adopted by

24   the Court in the Western District of North Carolina.

25           It is further ordered that defendant shall pay to

1 the United States a special assessment of $300.

2    The Court finds that defendant does not have the

3 ability to pay a fine, interest or attorney's fees.  The

4 Court, having considered the factors noted in 18 U.S.C.

5 Section 3572(a), will waive payment of a fine, interest and

6 attorney's fees in this case.

7    Defendant shall forfeit defendant's interests in

8 properties identified by the United States.

9    And the Court incorporates by reference the consent

10 judgment of forfeiture, which is Document No. 37 in the

11 Electronic Case File.

12    Payment of the criminal monetary penalties shall be

13 due and payable immediately.  The Court has considered the

14 financial and other information contained in the presentence

15 report and finds that the following is feasible:

16    If the defendant is unable to pay any monetary

17 penalty immediately, during the period of imprisonment,

18 payment shall be made through the Federal Bureau of Prison's

19 Inmate Financial Responsibility Program.  Upon release from

20 imprisonment, any remaining balance shall be paid in monthly

21 installments of no less than $50 to commence within 60 days

22 until paid in full.

23    Throughout the period of supervision, the probation

24 officer shall monitor the defendant's economic circumstances,

25 and shall report to the Court with recommendations, as

1    warranted, any material changes that affect the defendant's

2    ability to pay any court ordered penalties.

3            Place of designation?

4            MR. DAVIS:  As close to Gastonia as possible, Your

5    Honor.

6            And given his -- the drug issues highlighted in

7    Dr. Cohen's report, we'd also ask he be allowed to

8    participate in any appropriate treatment that would

9    available.

10           THE COURT:  The Court would recommend to the Bureau

11   of Prisons that the defendant be designated as close to

12   Gastonia, North Carolina, as possible and provide the

13   defendant substance abuse treatment.

14           I think based on the sentence and on that time

15   served, he wouldn't qualify for the RDAP program, would he?

16           MR. DAVIS:  I think -- I think that is likely true,

17   Your Honor.  Those rules have -- those guidelines have

18   shifted a little bit.  So I would ask the Court to keep that

19   open, but I think the Court is probably right about that.

20           THE COURT:  All right.  The Court would add to the

21   proposed sentence that the Court calls to the custodial

22   authorities that the defendant has a history of substance

23   abuse and recommends the defendant be allowed to participate

24   in any available substance abuse treatment programs while

25   incarcerated and, if eligible, to receive benefit of Title

1  18, U.S. Code, Section 3621(e)(2).

2          And the Court will also impose mental health as

3  well as drug treatment during his period of supervision.

4          Now, I think I've covered everything.

5          MR. DAVIS:  I believe so, Your Honor.

6          THE COURT:  Now, is there any legal reason why the

7  sentence should not be imposed?

8          MR. SAVAGE:  No, Your Honor.

9          MR. DAVIS:  No, Your Honor.

10          THE COURT:  Mr. Savage, Counts Five and Six are to

11  be dismissed?

12          MR. SAVAGE:  Yes, Your Honor.  Just to clear for

13  the record --

14          THE COURT:  Four, Five and Six.

15          MR. SAVAGE:  Yes.  The Court is comparting to

16  offense level 16 and 22?

17          THE COURT:  Thank you.  I am so sorry.  I've been

18  -- I've been using "variance" instead of "departure" so long

19  I forgot that you have to calculate the offense level.  Thank

20  you.  Yes.  Sixteen, 16/1.

21          MR. SAVAGE:  Thank you.

22          MR. DAVIS:  Yes, Your Honor.  The Government,

23  pursuant to its agreement with the defendant, moves to

24  dismiss the remaining counts of the indictment.

25          THE COURT:  And 16/I is 21 to 27 months.

1        The Court grants leave to the Government to move to

2 dismiss and hereby orders the dismissal of all other counts

3 in the indictment naming the defendant, other than Counts

4 One, Two and Three to which he pled.

5        Now, Mr. Litteral, in exchange for benefits you

6 receive for entering into the plea agreement with the United

7 States, you have waived your right to contest your conviction

8 and sentence either on direct appeal or in a separate civil

9 action, sometimes referred to as a 2255 motion or a habeas

10 corpus motion.

11        You have preserved your right to raise claims of

12 ineffective assistance of counsel and claims of prosecutorial

13 misconduct.

14        Now, do you understand this limitation on your

15 right of appeal?

16        THE DEFENDANT:  Yes, sir, I do.

17        THE COURT:  All right.  Now, if you do choose to

18 appeal, any notice of appeal must be filed within 14 calendar

19 days from the date of written judgment.  If you're unable to

20 pay the cost of an appeal, you may apply for leave to appeal

21 at no cost to you.  And if you so request, the Clerk of Court

22 will prepare and file a notice of appeal on your behalf.  The

23 Court recommends that you talk to Mr. Davis about your appeal

24 rights and procedures.

25        Do you understand these appeal rights and

1    procedures as the Court has stated them to you?

2              THE DEFENDANT:  Yes, sir, I do.

3              THE COURT:  All right.  You're currently in the

4    custody of the U.S. Marshal Service.  You'll be transferred

5    to the U.S. Bureau of Prisons for service of your sentence.

6    That takes anywhere from a couple of weeks to a couple of

7    months.

8              Do you have any questions for the Court?

9              THE DEFENDANT:  No, sir, I do not.

10             THE COURT:  Anything else from counsel?

11             MR. DAVIS:  Nothing from the defense, Your Honor.

12             MR. SAVAGE:  Nothing from the Government, Your

13   Honor.

14             THE COURT:  All right.  Then the sentence as

15   proposed is hereby ordered imposed.  This case is concluded.

16             Good luck to you, sir.

17             (The proceedings concluded at 12:42 p.m.)

18                        *    *    *

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CLR, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 29th day of July 2016.


/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CLR
U.S. Official Court Reporter